UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:   HON. TIMOTHY C. STANCEU

CONTINENTAL AUTOMOTIVE SYSTEMS, INC.,

                            Plaintiff,

      -against-

UNITED STATES,

                            Defendant.

Court No. 18-00026


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR**
<u>**SUMMARY JUDGMENT**</u>

Anastasia P. Cordova, Esq.
Shawn R. Fox, Esq.
McGUIREWOODS LLP
Attorneys for Plaintiff
1251 Avenue of the Americas
20th Floor
New York, New York 10020
(212) 548-7016
acordova@mcguirewoods.com
sfox@mcguirewoods.com
*Attorneys for Plaintiff Continental Automotive Systems, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

RELEVANT STATUTORY PROVISIONS AND EXPLANATORY NOTES ........................... 2

THE SUBJECT MERCHANDISE .......................................................................................... 2

SUMMARY OF ARGUMENT ............................................................................................... 3

APPLICABLE STANDARD OF REVIEW .............................................................................. 4

    A.    THIS ACTION IS RIPE FOR SUMMARY JUDGMENT. ................................. 4

    B.    BURDEN OF PROOF ....................................................................................... 5

    C.    CUSTOMS' POSITION IS NOT ENTITLED TO DEFERENCE ...................... 5

ARGUMENT ......................................................................................................................... 8

    A.    THE PROPER CLASSIFICATION FOR THE PROBE AND THE NOx
           SENSOR IS HEADING 9026. ......................................................................... 8

        1.    HTSUS Heading 9026 ........................................................................... 8

        2.    HTSUS Heading 9027 ........................................................................... 9

        3.    Definition of "Analysis" ....................................................................... 9

        4.    The NOx Sensor is a Measuring, not Analytical, Device. ...................... 11

        5.    Defendant's Classification is Not Supported by their Expert's
             Testimony or Law. ............................................................................... 13

    B.    CUSTOMS RULINGS SUPPORT PLAINTIFF'S POSITION. ......................... 15

CONCLUSION ..................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airflow Technology, Inc. v. United States,*
    31 CIT 524 (2007) ................................................................................4

*Amoco Corporation v. United States,*
    29 CIT 1408 (2005) ..............................................................................7

*August Bentkamp v. United States,*
    40 C.C.P.A. 70 (1952) .........................................................................10

*Bausch & Lomb, Inc. v. United States,*
    148 F.3d 1363 (Fed. Cir. 1998) .........................................................4, 5

*Boen Hardwood Flooring, Inc. v. United States,*
    357 F.3d 1262 (Fed. Cir. 2004) ..........................................................10

*Burrows Equipment Co. v. United States,*
    62 Cust. Ct. 681 (1969) ...................................................................14, 15

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ...............................................................................4

*Clarendon Marketing, Inc. v. United States,*
    144 F.3d 1464 (Fed. Cir. 1998) ............................................................4

*E.M. Labs, Inc. v. United States,*
    80 Cust. Ct. 125 (1978) ...................................................................14, 15

*Jarvis Clark Co. v. United States,*
    733 F.2d 873 (Fed. Cir. 1984) ..............................................................5

*John H. Faunce, Inc. v. United States,*
    64 Cust. Ct. 491 (1970) ...................................................................14, 15

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ...............................................................................4

*Mead Corp. v. United States,*
    283 F.3d 1342 (Fed. Cir. 2002) ............................................................6

*Medline Indus., Inc. v. United States,*
    62 F.3d 1407 (Fed. Cir. 1995) ............................................................10

*Pharmacia Fine Chemicals, Inc. v. United States,*
    9 CIT 438 (1985) ...................................................................................14

*Rocknel Fastener, Inc. v. United States,*
    267 F.3d 1354 (Fed. Cir. 2001)..................................................................6

*Rockwell Automation, Inc. v. United States,*
    31 CIT 692 (2007) ......................................................................................7

*Rollerblade, Inc. v. United States,*
    112 F.3d 481 (Fed. Cir. 1997)....................................................................4

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944)...........................................................................5, 6, 8

*United States v. Mead,*
    533 U.S. 218 (2001).....................................................................................6

*United States v. Pan Pac. Textile Group Inc.,*
    276 F. Supp. 2d 1316 (2003) .......................................................................4

*Universal Elecs. Inc. v. United States,*
    112 F.3d 488 (Fed. Cir. 1997)..................................................................10

*Warner-Lambert Co. v. United States,*
    407 F.3d 1207 (Fed. Cir. 2003).................................................................6

*Witex, U.S.A., Inc. v. United* States,
    32 CIT 1009 (2008) .............................................................................10, 13

**Statutes**

28 U.S.C. § 2639(a)(1)......................................................................................4, 5

**Other Authorities**

2003 McGraw-Hill Dictionary of Scientific and Technical Terms, 6th ed., 2003 ...................9, 12

Rule 56(c)..............................................................................................................4

Plaintiff Continental Automotive Systems, Inc. ("Plaintiff" or "Continental") submits this memorandum in support of its motion for summary judgment and asks that an order be entered: 1) granting its motion for summary judgment; 2) finding that the subject merchandise was misclassified by the United States Customs and Border Protection ("Customs"); 3) holding that the correct classification is heading 9026, Harmonized Tariff Schedule of the United States ("HTSUS"); and 4) ordering Customs to reliquidate the subject entries with a refund of all overpayments of duty with interest as provided by law.

## INTRODUCTION

This action involves multiple entries filed at the various ports of entry between November 2014 and July 2019. *See* Plaintiff's Statement of Material Facts not in Dispute ¶ 1 ("PSMF").

The merchandise whose classification is at issue here consists of the oxides of nitrogen ("NOx") sensor and the probe element (the "Probe") thereof. Customs classified the NOx sensor[1] in HTSUS subheading 9027.10.20.[2] Plaintiff asserts classification in HTSUS heading 9026. The defining issue is whether the Probe in particular and the NOx sensor in general are measuring devices within the meaning of HTSUS sheading 9026 or analytical devices within the meaning of HTSUS heading 9027. Customs' justification for its classification position is set forth in Headquarters Ruling Letter ("HRL") H262310 (July 11, 2016).[3]

---

[1]  At the time Customs made its classification, Continental was importing the entire NOx sensor, not only the Probe. When Continental filed the Complaint in this action, only the Probe was being imported. According to Customs, if an entire device is classified in heading 9027, any part of that device must be so classified. As a result, even though Continental imports only the Probe, the entire NOx sensor has to reclassified for the Probe to be classified in the correct HTSUS heading (9026).

[2]  All references to the HTSUS are to the 2021 version, which in respect to the relevant provisions is identical to earlier versions.

[3]  Copies of HRL H262310 and the other Customs rulings referred to here are found in the Addendum to this Memorandum.

## RELEVANT STATUTORY PROVISIONS AND EXPLANATORY NOTES

The relevant statutory provisions and the corresponding Explanatory Notes are found in the Addendum to this Memorandum.

## THE SUBJECT MERCHANDISE

The merchandise whose classification is the subject of this action consists of the NOx sensor and the Probe, which is a part of the NOx sensor. PSMF ¶ 6. The Probe is a mass produced element of NOx sensors, designed for use in consumer passenger vehicles and trucks. *Id.* ¶ 7. The most common application for the NOx sensors is in selective catalytic reduction ("SCR") systems, which condition a vehicle's exhaust gas before it is emitted in order to reduce pollutants. In an SCR system, a NOx sensor is placed at the entrance and at the exit of the system to permit a processing unit to determine the amount of NOx in the exhaust gas. PSMF ¶ 8.

The NOx sensor consists of the Probe (that produces an electric signal), signal conditioning electronics (that converts and sends the electric signal from the probe), also referred to as a signal control unit ("SCU"), and a connecting harness. PSMF ¶ 9. The Probe operates by means of a ceramic electrode. When the electrode comes into contact with NOx, a reaction occurs which disassociates oxygen from nitrogen and generates an electrical signal produced by oxygen ions that correlates to the concentration of NOx present in the exhaust. PSMF ¶ 10.

The Probe requires a way to turn its output into an electric signal that can be read by a processing unit. PSMF ¶ 11. It is the signal conditioning electronics that convert the Probe's simple electric signal from the electrochemical reaction to one that can be read by an Engine Control Unit (an "ECU"). *Id.* The ECU, which is essentially a computer that is not part of the NOx sensor, uses the electrical signal from the NOx sensor, along with inputs from other sensors, to generate the parts per million ("ppm") value of NOx in the exhaust. PSMF ¶ 12.

The SCR system first measures the approximate amount of NOx entering the system using the signal from a NOx sensor. PSMF ¶ 13. The ECU, which his not part of the NOx sensor, uses the information from the NOx sensor, in conjunction with information from other components, to calculate the amount of ammonia, in the form of a urea solution, that must be injected into the exhaust gas as it enters the SCR catalyst. *Id.* The ammonia reacts with NOx molecules and reduces NOx concentration in the exhaust stream by creating water and carbon dioxide. *Id.* Then, the NOx sensor at the exit of the SCR system again checks the amount of NOx and relays information to the ECU. PSMF ¶ 14. The ECU uses the information from the NOx sensor, in conjunction with information from other components, to determine if the system is working properly. *Id.* The Probe senses the NOx concentration and generates an electric impulse. PSMF ¶ 15. Signal conditioning electronics are required to generate an electrical signal that can be read by the ECU. *Id.* Neither the Probe nor the NOx sensor conducts any analysis, all analysis occurs in and is done by the ECU. The Probe by itself has no analytical capabilities. *Id.*

The Probe elements are representative of a large class of Probe part numbers, a list of which is included as Exhibit A to the Amended Complaint. PSMF ¶ 20. None of these units has any measuring or analytical capabilities.

## SUMMARY OF ARGUMENT

The correct classification of the NOx sensor is HTSUS heading 9026, not 9027. The function the NOx sensor performs is creation of an electric signal from the NOx concentration in the exhaust gas. It performs no analysis. When this function is reviewed against the language of the HTSUS headings at issue, the relevant Explanatory Notes, and the general definitions of the words "analysis" and "measurement," it becomes clear that the NOx sensor falls squarely within the scope of HTSUS heading 9026. Further, the majority of Customs rulings on this issue favor classifying the NOx sensor in HTSUS heading 9026. As a result, no fact can be genuine in dispute

that the NOx sensor must be reclassified in HTSUS heading 9026 as a measuring device. Continental is thus entitled to summary judgment in its favor.

## APPLICABLE STANDARD OF REVIEW

A.      THIS ACTION IS RIPE FOR SUMMARY JUDGMENT.

USCIT Rule 56(c) provides that summary judgment is appropriate where "(T)he discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of fact exists, the court reviews the evidence submitted drawing all inferences against the moving party. *See United States v. Pan Pac. Textile Group Inc.*, 276 F. Supp. 2d 1316, 1319 (2003); *see also Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Further, while a presumption of correctness applies to the government classification pursuant to the terms of 28 U.S.C. § 2639(a)(1), the presumption is not relevant when, as here, the parties are of a single mind as to the facts. *Rollerblade, Inc. v. United States*, 112 F.3d 481, 484 (Fed. Cir. 1997).

This court may resolve a classification issue by means of summary judgment. *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998). Summary judgment is appropriate where the nature of the merchandise is not in question and the sole issue before the court is the proper classification of the merchandise. *Bausch & Lomb*, 148 F.3d at 1365. Thus, in the absence of genuine factual issues, the propriety of summary judgment turns on the proper construction of the HTSUS, which is a question of law. *Clarendon Marketing, Inc. v. United States*, 144 F.3d 1464, 1466 (Fed. Cir. 1998); *Airflow Technology, Inc. v. United States*, 31 CIT 524 (2007).

As the pleadings demonstrate, the parties agree as to the nature of the subject merchandise. *See*, PSMF ¶ 6. Consequently, the sole issue before the court is the proper construction of the

competing HTSUS provisions, a question of law. Therefore, this action is ripe for summary judgment.

B.    <u>BURDEN OF PROOF</u>

Plaintiff has the initial burden of establishing by a preponderance of the evidence, that Customs' classification is incorrect. 28 U.S.C. §2639(a)(1). Nevertheless, it is the duty of the court to find the correct result. "[T]he trial court . . . must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative [claim]. . . The court's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) (emphasis in original).

The ultimate question in every tariff classification case is one of law, specifically "whether the merchandise is properly classified under one or another classification heading." *See Bausch & Lomb*, 148 F.3d at 1365. This generally leads to a two-step analysis. The first is to construe the relevant tariff classification provisions, a question of law. The second step in the analysis is a factual inquiry to determine what the merchandise is. *Id.*

C.    <u>CUSTOMS' POSITION IS NOT ENTITLED TO DEFERENCE.</u>

The position taken by Customs in HRL H262310, Addendum at 5, is not entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). In *Skidmore*, the Supreme Court set forth the factors a reviewing court is to consider in determining how much weight to afford an agency decision. The court held:

> The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore*, 323 U.S. at 140.

The courts recognize that classification rulings issued by Customs are entitled to a measure of respect proportional to their power to persuade. *United States v. Mead*, 533 U.S. 218, 235 (2001) (quoting *Skidmore*, 323 U.S. 134 at 140). The power to persuade depends on a number of factors, including the thoroughness of the ruling, the validity of the reasoning, and the formality with which the particular ruling was established. *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2003) (*citing Skidmore*, 323 U.S. at 140). However, the Court has an "independent responsibility to decide the legal issue regarding the proper meaning and scope of the HTSUS terms." *Mead Corp. v. United States*, 283 F.3d 1342, 1346 (Fed. Cir. 2002) (citing *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1358 (Fed. Cir. 2001)). HRL H262310 is not entitled to *Skidmore* deference because it exhibits none of the factors that the courts have deemed necessary to create the power to persuade.

Basically, the ruling argues in a conclusory manner that "[t]he process by which the NOx sensor detect [sic] the concentration (the amount/value) of NOx in a vehicle's exhaust gas in unit measurement of parts per million (ppm) constitutes gas analysis." HRL H262310 at 4-5. The ruling goes on to say that "[t]he function of the subject NOx sensors is to detect nitric oxide in the vehicle exhaust, calculate its concentration as expressed as ppm, and generate a corresponding [electrical] signal to the vehicle's ECU." *Id.* at 5.

HRL H262310 contains little by way of analysis or explanation. For example, the ruling does not explain at all why the NOx sensor is more like a combustion gas analysis apparatus, such as a Fourier Transfer Infrared Spectrometer ("FTIR"), which is classified under HTSUS 9027 and is capable of mathematically analyzing optical spectra and determining the composition of multiple gases, and not a measurement device such as a flow meter that checks or measures a gas variable, i.e. concentration of NOx. Furthermore, the only two cases Customs relied on in reaching

its classification did not even involve the HTSUS, but rather a different version of the Tariff Schedule. The lack of thoroughness negates any claim that HRL H262310 is entitled to deference. *Rockwell Automation, Inc. v. United States*, 31 CIT 692, 700 (2007); *Amoco Corporation v. United States,* 29 CIT 1408, 1417 (2005).

Similarly lacking from HRL H262310 is consistency. Less than a year prior to the ruling, on November 23, 2015, Customs issued another ruling, N270334, concerning classification of a hydrogen sensor in a vehicle fuel cell. Addendum at 6. The hydrogen sensor is used within fuel cell-equipped vehicles, positioned within the hydrogen storage tank. The sensor functions to detect hydrogen leaks. If a leak is detected, the sensor outputs an electrical signal to the vehicle's ECU. *Id.* at 1. The ECU then sends a signal to a warning indicator on the dashboard and/or initiates a vehicle shut down. *Id.* In classifying the hydrogen sensor, Customs specifically rejected classification under HTSUS heading 9027, finding that "the subject product is ***merely detecting the presence of hydrogen*** and not performing any type of analysis. As such classification in heading 9027 is inapplicable." *Id.*

In HRL H262310, however, Customs did an apparent about face, finding that mere detection of NOx by the NOx sensor and transmission of a corresponding electrical signal to the ECU constitutes analysis. Addendum at 5, at 5. Customs even acknowledged this inconsistency in their own internal communications preceding HRL H262310. *See* Addendum at 13, Dep. Tr., G. Aduhene, Jan. 29, 2020, Ex. 9, CBP000232 ("If a product, like the subject sensors, helps facilitate analysis, then it constitutes an instrument for physical or chemical analysis of heading 90.27. If that's the case, how would you distinguish the instant sensors from the hydrogen sensor?"); *id.* ("However, if we adopt that interpretation of 'analysis,' then wouldn't heading 90.27 cover any 'measuring or checking' device in light of the fact (?) that data points must always be

measured or checked before they're analyzed."); *Id.*, Ex. 7, CBP000259 ("Before the meeting with [Continental] we were leaning towards classifying the NOx sensors under heading 9027, HTSUS, but I am afraid we might have reassess that position and consider classifying the NOx sensors under 9026.").

Ruling N270334, along with Customs' internal communications, demonstrate the absence of consistency with Customs' "earlier and later pronouncements" regarding the NOx sensor. *Skidmore*, 323 U.S. at 140. As a result, HRL H262310 is not entitled to deference.

## ARGUMENT

A. **THE PROPER CLASSIFICATION FOR THE PROBE AND THE NOx SENSOR IS HEADING 9026.**

The gravamen of this litigation is weather the Probe element of the NOx sensor, as well as the NOx sensor itself, is a measuring device properly classifiable in HTSUS heading 9026, or an analytical device subject to classification in HTSUS heading 9027. As set forth herein, no material fact can be genuinely in dispute that the Probe and the NOx sensor are merely measuring devices.

### 1. **HTSUS Heading 9026**

Heading 9026 provides for "instruments and apparatus for measuring or checking the flow, level, pressure or other variables of liquids or gasses (for example, flow meters, level gauges, manometers; heat meters), excluding instruments and apparatus of heading 9014, 9015, 9028 or 9032." Explanatory Note 90.26 states, "this heading covers instruments and apparatus for measuring or checking the flow, level, pressure kinetic energy or other **process variables of liquids or gasses**. The instruments and apparatus of this heading may be fitted with recording, **signaling** or optical scale-reading devices or **transmitters with an electrical**, pneumatic or hydraulic **output**. Measuring or checking apparatus generally incorporates **an element sensitive**

**to variations in the quantity to be measured** (e.g., Bourdon tube, diaphragm, bellows, semiconductors) moving a needle or a pointer. **In some devices the variations are converted into electrical signals.**" [Emphasis added]. The McGraw Hill Science & Technology Dictionary defines the term "process variable" as "any of those varying operational and physical conditions associated with a chemical processing operation, such as temperature, pressure, flowrate, density, pH, viscosity, or chemical composition." *See* definition for "process variable" in *2003 McGraw-Hill Dictionary of Scientific and Technical Terms*, 6th ed., 2003, p. 1677.

### 2. HTSUS Heading 9027

Heading 9027 covers "instruments and apparatus for physical or chemical analysis." Subheading 9027.10 covers "gas or smoke analysis apparatus." Explanatory Note 90.27(8) describes the type of gas or smoke analysis provided for by subheading 9027.10. The Note states:

> These [apparatus] are used to analyse combustible gasses or combustion by-products (burnt gasses) in coke ovens, gas producers, blast furnaces, etc., in particular, for determining their content of carbon dioxide, carbon monoxide, oxygen, hydrogen, nitrogen or hydrocarbons. Electrical gas or smoke analysis apparatus are mainly for determining and measuring the content of the following gasses: carbon dioxide, carbon monoxide and hydrogen, oxygen, sulphur dioxide, ammonia … It should be noted that the heading includes gas or smoke analysis apparatus for use in industrial processes (i.e., directly connected to furnaces, gas generators, etc.).

Explanatory Note 90.27 contains many examples of instruments that fall under heading 9027. All are sophisticated analytical instruments commonly used in laboratories, including chromatographs, electrophoresis instruments, spectrophotometers, nuclear magnetic resonance instruments, and mass spectrometers.

### 3. Definition of "Analysis"

The HTSUS does not define the terms "analysis" and "measurement" used in headings 9027 and 9026. When a term is not defined in the HTSUS or the legislative history and "does not

have a commercial meaning distinct from the common meaning that is general, definite, and uniform, the court will look to the common meaning of the term." *Witex, U.S.A., Inc. v. United States*, 32 CIT 1009, 1013 (2008) (citing *August Bentkamp v. United States*, 40 C.C.P.A. 70, 78 (1952)). The common meaning of a tariff term is a matter of law to be determined by the court. *Universal Elecs. Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997). "In determining the common meaning of a tariff term, the court may consult lexicographic sources such as dictionaries as well as scientific authorities, industry sources, and other reliable sources of information." *Witex, U.S.A.*, 32 CIT at 1013 (citing *Medline Indus., Inc. v. United States*, 62 F.3d 1407, 1409 (Fed. Cir. 1995)). "Other reliable sources" may include "documentation from the relevant domestic industry and reference sources relied upon by people working in the industry." *Id.*; *see also Boen Hardwood Flooring, Inc. v. United States*, 357 F.3d 1262 (Fed. Cir. 2004) (using various technical sources to determine the common meaning of "plywood" in HTSUS 4412).

In common parlance, the term "analyze" means to "study or determine the nature and relationship of the parts of (something) by analysis." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/analyze (last visited October 10, 2021). Similarly "analysis" means "a detailed examination of anything complex in order to understand its nature or to determine its essential features: a thorough study." *Id.*, https://www.merriam-webster.com/dictionary/analysis. The word "check," by contrast, means "to look at or in something to see or find what is there" or "to inspect, examine." *Id.*, https://www.merriam-webster.com/dictionary/check. Likewise, "measure" means "to ascertain the measurements of." *Id.*, https://www.merriam-webster.com/dictionary/measure. The term "measurement," in turn, means "a figure, extent, or amount obtained by measuring." *Id.*, https://www.merriam-webster.com/dictionary/measurement.

#### 4.     The NOx Sensor is a Measuring, not Analytical, Device.

The combination of Explanatory Notes, commonplace definitions of "analyze," "measure," and "check," and the expert testimony delivered in the case conclusively establishes that the NOx sensor is a measuring device and not an analytic device.

The Probe, as Defendant readily admits, has no measuring, *let alone analytical* capabilities. *See* Addendum at 14, Dep. Tr., C. Bartholomew, Mar. 19, 2021, 142:14-15 ("The probe by itself can do nothing.  It can't measure or analyze.").

The NOx sensor is also not an analytical instrument.  It cannot accurately determine individual components of NOx—nitric oxide ("NO") and nitric dioxide ("NO2") concentrations, but only senses their combined property, the sum of NO and NO2.  PSMF ¶ 17.  The sensor performs no additional processing, but merely outputs the NOx sensor measurement electrical signal.  PSMF ¶ 18.  It does not do a level comparison, actuate an alarm, display processing, data log, or accomplish multi-gas discrimination, which are all common features of analytical devices. *Id.*  Specifically, its essential function is to measure and check one of the variables of a combustion, power generation, and emissions control process.  *Id.*  That process variable is NOx concentration; a combination of NO and NO2 molecules. The sensor is not able to measure NO and NO2 individually; it is unable to analyze the exhaust gas and distinguish among chemical species as would a gas analyzer.  *Id.*  Also, the NOx sensor cannot distinguish ammonia (NH4), the active ingredient in the urea being injected, from NO and NO2.  That distinction is made by analysis and calculations done in the ECU.  PSMF ¶ 19.

This function is entirely consisted with the description of the devices classifiable in heading 9026.  Specifically, Explanatory Note 90.26 provides that heading 9026 applies to instruments that measure or check, among other things, "process variables of liquids or gases."  Since the definition of "process variable" includes "chemical composition," (2003 McGraw-Hill Dictionary of

Scientific and Technical Terms, 6th ed., 2003, p. 1677), NOx content is just one process variable of the exhaust gas in a vehicle. Additional sensors measure exhaust pressure, temperature, oxygen, hydrogen, and other such process variables.

Similarly, consistent with the application of heading 9026, instruments subject to that heading may be fitted with, *inter alia*, transmitter with an electrical output. Explanatory Note 90.26. In line with this description, the NOx sensor is equipped with a transmitter that outputs an electrical signal commensurate with the concentration of NOx in the exhaust. Further, as Explanatory Note 90.26 contemplates, the concentration is converted into an "electrical signal." *Id.*

The function of the NOx sensor is also in line with the general definitions of the words "check" and "measure." Specifically, the NOx sensor checks the exhaust gas to ascertain the concentration of NOx. It does not perform a thorough or detailed examination of the exhaust gas to "understand its nature" or "determine its essential features," which is the definition of the word "analyze." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/analyze (last visited June 1, 2021); *see also*, Addendum at 17, Dep. Tr., J. Schuster, Mar. 23, 2021, 81:4-12. To that end, the NOx sensor cannot even tell the difference or discriminate among the gases it "senses," *i.e.*, NO, NO2, or ammonia—all it does is provide a combined electrical signal, which gets sorted out into separate readings in the ECU. PSMF ¶¶ 10, 17; *see also* Addendum at 18, Dep. Tr., J. Schuster, Mar. 23, 2021, 95:11-22; 56:14-57:4. As a result, the sensor's function is a far cry from "understanding" the nature of the exhaust gas or determining its "essential features."

Nor is the sensor considered an analytical device in the automotive engineering industry. Specifically, Continental's expert and an automotive engineer with decades of experience testified

that professionals working in the automotive field "use sensors to measure and check things in the actual system, and we use analysis equipment in the lab to test things where we try to find out a more detailed examination of something complex. And the basis is that this is used in a control system to look at a process variable." Addendum at 19, Dep. Tr., J. Schuster, Mar. 23, 2021, 29:7-18. Again, in the absence of relevant definitions in the HTSUS, this Court should consider the applications and definitions "relied upon by people working in the industry." *Witex, U.S.A.*, 32 CIT at 1013.

### 5. Defendant's Classification is Not Supported by their Expert's Testimony or Law.

To demonstrate that the NOx sensor is an analytical device, Defendant will likely rely on the testimony of its expert, Calvin Bartholomew, Ph.D. Dr. Bartholomew is a chemist and an academic, who has never worked with sensors and had not even seen a NOx sensor or had an understanding of how it worked prior to being provided an exemplar in this case. Addendum at 15, Dep. Tr., C. Bartholomew, Mar. 19, 2021, 72:11-24; 98:11-14. In reviewing the NOx sensor, Dr. Bartholomew posited that the definition of "chemical analysis," commonly used in laboratories would find that the NOx sensor was an analytic device. However, his own testimony undercuts his finding.

Dr. Bartholomew testified that in a lab setting, "chemical analysis" has four distinct steps: (1) separation and sample collection/treatment; (2) measurement; and (3) data acquisition and processing. Addendum at 16, Dep. Tr., C. Bartholomew, Mar. 19, 2021, 126:19-127:5. This lab-controlled process involves multiple sub-processes. Dr. Bartholomew admitted the NOx sensor does not—indeed cannot—perform numerous of these tasks. *Id.*, Dep. Tr., C. Bartholomew, Mar. 19, 2021, 141:25-142:11 (admitting that the ECU is needed to complete the data acquisition and

processing step). Despite his conclusion, Dr. Bartholomew's own expert testimony confirms that the NOx sensor does not perform "chemical analysis" and is not an analytical device.

Moreover, the two cases on which Customs relies similarly fail to support their position on classification. In *Pharmacia Fine Chemicals, Inc. v. United States*, 9 CIT 438 (1985), this Court considered whether certain merchandise that was used for purifying liquids by separating them performed chemical analysis. This Court found that a device "which merely separates materials to obtain a purified substance is not within the commercial meaning of 'apparatus for chemical analysis.'" *Pharmacia Fine Chemicals, Inc.*, 9 CIT at 440. Although this Court rejected Customs' position, it did discuss a few other cases for comparison, where a device had been held to perform analysis. *John H. Faunce, Inc. v. United States*, 64 Cust. Ct. 491, 495 (1970), for example, involved an apparatus used in an area of physical chemistry to "determine the atomic structure of crystals" and enable the scientists "to understand its essential features and to obtain much valuable information concerning other physical and chemical properties."

*E.M. Labs, Inc. v. United States*, 80 Cust. Ct. 125, 126-127 (1978) concerned TLC plates, which, through application of a developing solvent, could break down a substance into its component elements, "permitting an identification of the separated substances and their component elements [by utilizing an additional device]." The Court merely states, in dicta, that the TLC plates are "analytic instruments." *Id.* Finally, *Burrows Equipment Co. v. United States*, 62 Cust. Ct. 681, 683 (1969) involved vitascopes, which are instruments "for determining the germinating capacity of seeds." The enzymes in the seed would come into contact with the chemical solution in the vitascope, staining it red if the seed was germinable and remaining uncolored if it was not. *Id.* The court held that the vitascope performed chemical analysis because

it "determine[d] the germinability of seed by ascertaining whether or not the seed contains enzymes." *Id.* at 685.

The NOx sensor does not have any capabilities similar to the devices in the cases above that would classify it as an analytical instrument. Unlike the apparatus in *John H. Faunce, Inc.*, the NOx sensor does not determine the atomic structure or any other physical or chemical property of anything—it simply senses the presence of NOx and relays the value of the concentration to the ECU where it is obtained in usable format. Also contrary to the TLC plates in *E.M. Labs, Inc.*, the NOx sensor does not break the exhaust gas into its components or allow for identification of each component at the end (in fact, the composition of the exhaust gas is already known by the time it reaches the sensor—all that the sensor does is react to the NOx in the exhaust mix).

Nor is the NOx sensor at all like the vitascope in *Burrows Equipment Co.* because it does not determine any property of the exhaust gas but merely detects and measures the concentration of NOx. The NOx sensor ignores oxygen to enable detection and measurement of NOx, it does not determine any properties of the exhaust gas and does not spell out its components.

Classification in heading 9027 is limited to devices that perform analysis. Here, the NOx sensor performs no such analysis but merely measures the concentration of NOx, making it classifiable in heading 9026. Once the Court determines that the subject sensors fall within the terms of heading 9026, the inquiry is complete.

B.     CUSTOMS RULINGS SUPPORT PLAINTIFF'S POSITION.

Many Customs rulings illustrate that devices typically classified in heading 9027 have many more capabilities than the NOx sensor and therefore perform analysis within the meaning of Explanatory Note 90.27 and the commonplace definition of "analysis."

These rulings include: N270334 (November 23, 2015)[4] (hydrogen sensor detecting hydrogen and sending a corresponding signal to the ECU not analytical equipment under heading 9027); HQ 967082 (June 4, 2004)[5] (gas detectors capable of audible and visual alarms and readouts classified under heading 9027); NY D89283 (March 31, 1999)[6] (air flow sensor measuring the mass of air entering the engine and emitting an analog electric signal that would show a readout if connected to a computer classified in heading 9026); NY 851139 (April 24, 1990)[7] (gas sensor able to monitor four gases simultaneously and provide an immediate digital readout for each classified in heading 9027); and HQ 086057 (February 2, 1990)[8] (Smokerlyzer detecting carbon monoxide levels in breath and displaying a ppm signal on the face of the instrument classified under heading 9027).

Customs will undoubtedly argue that this Court should adopt the reasoning in HQ 086465 (June 20, 1990)[9] and N239797 (April 16, 2013)[10], wherein Customs determined that the oxygen sensor (HQ 086465) and its sensor element (N239797) where both classified in heading 9027. These two rulings, which Plaintiff submits were wrongly decided, highlight the lack of consistency in Customs' decisions. For example, Customs placed the oxygen sensor in heading 9027 because, as Customs argued, the Explanatory Note extends the definition of "smoke analysis apparatus" to devices "used to analyse gases or combustion by-products . . . for determining their content of carbon dioxide, carbon monoxide, oxygen, hydrogen, nitrogen, or hydrocarbons." Addendum at 11. If this logic was applied uniformly, then the hydrogen sensor would also be classified under

---

[4] Addendum at 6.
[5] Addendum at 7.
[6] Addendum at 8.
[7] Addendum at 9.
[8] Addendum at 10.
[9] Addendum at 11.
[10] Addendum at 12.

heading 9027 because—for the sake of the argument—it is "used to analyse gases . . . for determining their content of . . . hydrogen." *See* Explanatory Note 90.27. However, 25 years after the oxygen sensor ruling, Customs specifically *declined* to classify the hydrogen sensor in heading 9027. Addendum at 6.

Similarly, in HQ 086465 (the oxygen sensor ruling), Customs found that classification in heading 9027 is not dependent on the device's ability to provide a simultaneous readout. Addendum at 11. Yet, in HQ 967082, which was rendered 14 years later, Customs specifically stated that "the ability to display visual readouts of the gas level measurements" was "determinative for the purposes of classification" in heading 9027. Addendum at 7. Customs, thus, effectively overruled the oxygen sensor ruling by (1) declining to classify the hydrogen sensor, which is the same as both the oxygen and NOx sensors in all relevant respects; and (2) finding that the visual readout capability was essential to classification in heading 9027.

Because the NOx sensor (like the hydrogen sensor) does not have a visual readout capability (this step does not happen until the ECU), it is not classifiable in heading 9027. No fact is genuine in dispute regarding this conclusion.

The sum total of these rulings shows that devices typically classified in HTSUS heading 9027 have truly analytical features, such as discrimination between different chemical species, alarm capabilities, and simultaneous readouts without the need for an external computer such as the ECU. The NOx sensor has no such features and is, therefore, not properly classifiable in HTSUS heading 9027.

## CONCLUSION

The NOx sensor perform no analytical function; it simply measures the concentration of NOx in the exhaust gas. Therefore, and for the reasons set forth above, Plaintiff requests that its motion be granted, that the imported merchandise be determined to be classified properly in

heading 9026, HTSUS, and that Customs be ordered to reliquidate the subject entries at the applicable rate of duty in force on the dates of entry and to issue refunds to Plaintiff with interest as required by law.

Respectfully submitted,

McGUIREWOODS LLP
Attorneys for Plaintiff


By:    */s/ Anastasia P. Cordova*
Anastasia P. Cordova
Shawn R. Fox
1251 Avenue of the Americas
20th Floor
New York, New York 10020
(212) 548-7016
acordova@mcguirewoods.com
sfox@mcguirewoods.com


Dated:    New York, New York
October 13, 2021