**PUBLIC VERSION**

**CONFIDENTIAL INFORMATION HAS
BEEN REDACTED**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*
_____
CONTINENTAL AUTOMOTIVE SYSTEMS, INC.,     :
            :
           Plaintiff,      :
            :     Court No. 18-00026
           v.       :
            :
UNITED STATES,            :
            :
           Defendant.     :

## <u>ORDER</u>

Upon reading plaintiff's motion for summary judgment; defendant's cross-motion for summary judgment; plaintiff's response and reply; defendant's reply; and upon consideration of other papers and proceedings had herein, it is hereby

**ORDERED** that plaintiff's motion for summary judgment be, and hereby is, denied; and it is further

**ORDERED** that defendant's cross-motion for summary judgment be, and hereby is, granted; and it is further

**ORDERED** that judgment is entered for defendant and this action be, and hereby is, dismissed.

_____
TIMOTHY C. STANCEU, *SENIOR JUDGE*

Dated: New York, New York
      This _____ day of _____, 2022

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*
_____

| | | |
|---|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 18-00026 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of International Trade, defendant, United States, respectfully moves this Court for an Order: (1) denying plaintiff's motion for summary judgment; (2) granting our cross-motion for summary judgment; (3) entering judgment for defendant and dismissing this action; and (4) granting defendant such other and further relief as may be just and appropriate.  Summary judgment in favor of defendant is appropriate because there are no genuine issues of material fact, and defendant is entitled to judgment in its favor as a matter of law.

The bases for defendant's cross-motion for summary judgment are set forth in the (i) attached memorandum, (ii) case pleadings, (iii) certain exhibits submitted in connection with plaintiff's motion for summary judgment, (iv) defendant's response to plaintiff's Rule 56.3 statement of material facts not in dispute, (v) defendant's statement of material facts as to which there are no genuine issues to be tried, and (vi) exhibits 1 through 10 submitted with defendant's cross-motion for summary judgment.

**WHEREFORE**, defendant respectfully requests that an Order be entered (1) denying plaintiff's motion for summary judgment; (2) granting our cross-motion for summary judgment;

(3) entering judgment for defendant and dismissing this action; and (4) granting defendant such

other and further relief as may be just and appropriate.

<div style="margin-left:40%">

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:   /s/ Justin R. Miller
      JUSTIN R. MILLER
      Attorney-In-Charge
      International Trade Field Office

</div>

| | |
|---|---|
| *Of Counsel*: | /s/ Brandon A. Kennedy |
| Edward Maurer | BRANDON A. KENNEDY |
| Deputy Assistant Chief Counsel | Trial Attorney |
| Michael Anderson | Civil Division, U.S. Dept. of Justice |
| General Attorney | Commercial Litigation Branch |
| Office of the Assistant Chief Counsel | 26 Federal Plaza, Room 346 |
| International Trade Litigation | New York, New York 10278 |
| U.S. Customs and Border Protection | Tel.: (212) 264-9230 |
| New York, New York 10278 | *Attorneys for Defendant* |

Dated: December 22, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*
_____

| | | |
|---|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 18-00026 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel*:                              BRANDON A. KENNEDY
Edward Maurer                         Trial Attorney
Deputy Assistant Chief Counsel        Civil Division, U.S. Dept. of Justice
Michael Anderson                      Commercial Litigation Branch
General Attorney                      26 Federal Plaza, Room 346
Office of the Assistant Chief Counsel New York, New York 10278
International Trade Litigation        Tel.: (212) 264-9230
U.S. Customs and Border Protection    *Attorneys for Defendant*
New York, New York 10278

Dated: December 22, 2021

4

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ABOUT THE MERCHANDISE ...........................................11

INTRODUCTION.................................................................................................................13

PROCEDURAL BACKGROUND.......................................................................................14

STATEMENT OF FACTS ..................................................................................................14

QUESTIONS PRESENTED ................................................................................................18

SUMMARY OF ARGUMENT ...........................................................................................18

ARGUMENT .......................................................................................................................20

  I.     STANDARD OF REVIEW .....................................................................................20

  II.    THE SMART NOx SENSOR PROBE IS PROPERLY CLASSIFIED UNDER
       SUBHEADING 9027.10.20, HTSUS, BECAUSE IT IS AN ELECTRICAL GAS
       ANALYSIS APPARATUS.......................................................................................21

        a.  General Rules of Interpretation .......................................................................21

        b.  The Smart NOx Sensor Probe Is an Instrument or Apparatus for
            "Chemical Analysis", Identified in Heading 9027 ............................................23

            i.    "Chemical Analysis" Means Determining the Physical Properties
                or Chemical Composition of Something ...............................................24

            ii.   The Smart NOx Sensor Probe Performs the Function of
                Chemical Analysis ...............................................................................27

        c.  The Smart NOx Sensor Probe Is an Electrical "Gas or Smoke Analysis
            Apparatus," Identified *Eo Nomine* in Subheading 9027.10.20 .........................31

        d.  The Smart NOx Sensor Probe Is Similar to the Other Exemplars of Heading
            9027 .................................................................................................................36

        e.  Plaintiff's Arguments Involving Heading 9027 Are Unavailing .......................38

  III.   THE SMART NOx SENSOR PROBE IS NOT PROPERLY CLASSIFIED
       UNDER SUBHEADING 9026.80.20, HTSUS, BECAUSE IT IS NOT USED
       FOR "MEASURING OR CHECKING THE FLOW, LEVEL, PRESSURE OR
       OTHER VARIABLES OF LIQUIDS OR GASES" .....................................................47

a.  Plaintiff's Interpretation of Heading 9026 Is Not Supported by the Law……………………………………………………………………...........47

b.  The Smart NOx Sensor Probe Is Dissimilar to the Exemplars of Heading 9026………...............................................................................................54

IV.    THE ANALYSIS OF RULING H262310 IS CONSISTENT WITH THE ESTABLISHED FRAMEWORK FOR TARIFF CLASSIFICATION AND CLASSIFYING MERCHANDISE PURSUANT TO THE PLAIN MEANING OF THE TARIFF STATUTE ...................................................................58

CONCLUSION ........................................................................................................61

# TABLE OF AUTHORITIES

## Cases

*ABB, Inc. v. United States*,
28 CIT 1444, 346 F. Supp. 2d 1357 (2004) ............................................................21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................20

*Aves. In Leather, Inc. v. United States*,
423 F.3d 1326 (Fed. Cir. 2005) ............................................................................22

*Bausch & Lomb, Inc. v. United States*,
148 F.3d 1363 (Fed. Cir. 1998) ....................................................................20, 22

*BASF Corp. v. United States*,
482 F.3d 1324 (Fed. Cir. 2007) ............................................................................22

*BenQ Am. Corp. v. United States*,
646 F.3d 1371 (Fed. Cir. 2011) ............................................................................22

*Burrows Equipment Co. v. United States*,
300 F.Supp 455 (1969) ...............................................................................*passim*

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................20

*Clarendon Marketing, Inc. v. United States*,
144 F.3d 1464 (Fed. Cir. 1998) ............................................................................20

*Compare Aromont USA, Inc. v. United States*,
671 F.3d 1310 (Fed. Cir. 2012) ............................................................................36

*Cummins Inc v. United States*,
454 F.3d 1361 (Fed. Cir. 2006) ............................................................................22

*E.M. Labs, Inc. v. United States*,
80 Cust. Ct. 125 (1978) ..................................................................................44, 45

*Fuji Am. Corp. v. United States*,
519 F.3d 1355 (Fed. Cir. 2008) ............................................................................31

*GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*,
140 S. Ct. 1637 (2020) .........................................................................................49

*John H. Faunce, Inc. v. United States*,
64 Cust. Ct. 491 (1970) ..............................................................................43, 44

*JVC Co. of Am. v. United States*,
234 F.3d 1348, 1355 (Fed. Cir. 2000) ...........................................................24, 26

*Int'l Trading Co. v. United States*,
306 F. Supp. 2d 1265 (Ct. Int'l Trade 2004) .........................................................49

*Kahrs International, Inc. v. United States*,
713 F.3d 640 (Fed. Cir. 2013) ....................................................................31, 48

*Len-Ron Mfg. Co., Inc. v. United States*,
334 F.3d 1304, 1309 (Fed. Cir. 2003) ..................................................................23

*Link Snacks, Inc. v. United States*,
742 F.3d 962 (Fed. Cir. 2014) ..........................................................................23

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ......................................................................................20

*Michael Simon Design, Inc. v. United States*,
637 F. Supp. 2d 1218 (Ct. Int'l Trade 2009) ..........................................................31

*Nat'l Advanced Sys. v. United States*,
26 F.3d 1107 (Fed. Cir. 1994) ..........................................................................22

*Orlando Food Corp. v. United States*,
140 F.3d 1437 (Fed. Cir. 1998) .........................................................................22

*Pharmacia Fine Chemicals, Inc. v. United States*,
9 CIT 438 (CIT 1985) .............................................................................*passim*

*Phone-Mate, Inc. v. United States*,
690 F.Supp. 1048 (Ct. Int'l Trade 1988), *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989) .......................20

*Plexus Corp. v. United States*,
489 F. Supp. 3d 1379 (Ct. Int'l Trade 2020) ..........................................................58

*The Pomeroy Collection, Ltd. v. United States*,
559 F. Supp. 2d 1374, 1385 (Ct. Int'l Trade 2008) .................................................22

*Saab Cars USA, Inc. v. United States*,
434 F.3d 1359 (Fed. Cir. 2006) .........................................................................21

*Schlumberger Tech. Corp. v. United States*,
845 F.3d 1158 (Fed. Cir. 2017) ............................................................36

*Texas Apparel Co. v. United States,*
698 F. Supp. 932 (Ct. Int'l Trade 1988),
*aff'd* 883 F.2d 66 (Fed. Cir. 1989), cert denied 493 US 1024 (1990) ......................................20

*United States v. Mead Corp.,*
533 U.S. 218 (2001) ............................................................58

*United States v. Pan Pac. Textile Group Inc.*,
276 F. Supp. 2d 1316 (Ct. Int'l Tr. 2003)............................................20

*Warner-Lambert Co. v. United States*,
407 F.3d 1207 (Fed. Cir. 2005) ...........................................23, 27

**Statutes and Regulations**

28 U.S.C. § 2639(a)(1)............................................................21

Harmonized Tariff Schedule of the United States

General Rule of Interpretation 1 ............................................................22, 31

General Rule of Interpretation 6 ............................................................22

Chapter 90

Heading 9026 ............................................................*passim*

Subheading 9026.80.20 ............................................................*passim*

Explanatory Note 90.26............................................................49, 52, 53, 60

Explanatory Note 90.26(d) ............................................................*passim*

Heading 9027 ............................................................*passim*

Subheading 9027.10.20 ............................................................*passim*

Explanatory Note 90.27 ............................................................31, 32, 54

Explanatory Note 90.27 (8) ............................................................*passim*

Explanatory Note 90.27 (8) (viii)............................................................19, 35

**Rules**

USCIT Rule 56(c) ........................................................................................20

USCIT Rule 30(b)(6) …………………………………………………………...12

**Other Authorities**

HQ H262310 (July 11, 2016) ..................................................................*passim*

HQ H086465 (June 20, 1990) .........................................................................61

NY N239797 (April 16, 2013) ........................................................................61

NY N270334 (Nov. 23, 2015) .........................................................................60

NY J88011 (Sept. 11, 2003) ...........................................................................14

HQ 967082 (June 4, 2004) ..............................................................................60

NY D89283 (March 31, 1999) ........................................................................60

NY 851139 (April 24, 1990) ...........................................................................61

HQ 086057 (Feb. 2, 1990) ..............................................................................61

Antonin Scalia & Brian Garner, Reading Law: The Interpretation of Legal Texts 93 (2012).....49

*Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System: Submitting Report,*
USITC Pub. No. 1400 (June 1983) ...............................................................26, 30

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*
_____

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., : | |
| : | |
| Plaintiff, : | |
| : | Court No. 18-00026 |
| v. : | |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant. : | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States (the Government), submits this memorandum in opposition to plaintiff's, Continental Automotive Systems, Inc. (Continental), motion for summary judgment and in support of our cross-motion for summary judgment.  For the reasons set forth below, we respectfully request that the Court enter an order denying plaintiff's motion for summary judgment; granting our cross-motion for summary judgment; entering judgment for defendant; and dismissing this action.

**PRELIMINARY STATEMENT ABOUT THE MERCHANDISE**

The merchandise imported in the entries that are the subject of this action—the Smart NOx Sensor Probe (Probe)—consists of a probe element for nitrogen oxides (NOx) sensors with probe housing and cable (connecting harness).  Def. Statement of Material Facts as to Which There Are No Genuine Issues to Be Tried (Def. SOF), ¶ 1.  After importation, the probe element and connecting harness are assembled to a Sensor Control Unit (SCU) and its housing to complete Continental's "Smart NOx Sensor."  Def. SOF, ¶ 3; *see also* Figure 1 below, which is a photograph of a Smart NOx Sensor with these three components labeled, from Def. Ex. 3, at 4.



**Figure 1**

In Plaintiff's Statement of Material Facts Not in Dispute (Pl. SOF) and its Memorandum in

Support of Its Motion for Summary Judgment (Pl. Br.), plaintiff sometimes confusingly suggests

that the imported merchandise at issue is the Smart NOx Sensor. *Compare* Pl. SOF, at 1, 6-7, 9,

*with* Pl. Br., at 1-2. Continental imported the Smart NOx Sensor (or earlier versions thereof) at

other times, and the ruling discussed by the parties issued by U.S. Customs and Border

Protection (Customs or CBP), HQ H262310 (July 11, 2016), concerned an importation by

Continental of a NOx Sensor. However, based on the deposition testimony of plaintiff's

designated agent pursuant to USCIT Rule 30(b)(6) and the model numbers for the merchandise,

the merchandise imported in the entries before the Court is limited to the Smart NOx Sensor

Probe (*i.e.*, probe element with connecting harness). Pl. SOF, ¶ 20; Def. SOF, ¶ 1; Def. Ex. 4,

Meagher Depo. Tr. at 28:24–37:17; Entry Papers.

## INTRODUCTION

At issue is the appropriate tariff classification of the Smart NOx Sensor Probe, which determines the concentration of oxygen ($O_2$) and oxides of nitrogen (NOx) in exhaust gas entering and exiting the selective catalytic reduction (SCR) systems of passenger vehicles and trucks. The undisputed facts show that the Smart NOx Sensor Probes are properly classifiable as instruments or apparatus for chemical analysis under heading 9027 of the Harmonized Tariff Schedule of the United States (HTSUS), and more specifically, as gas or smoke analysis apparatus under subheading 9027.10.20, HTSUS.

Continental contends that the Smart NOx Sensor Probes should be classified under heading 9026, HTSUS, and more specifically under subheading 9026.80.20, HTSUS, as "[i]nstruments and apparatus for measuring or checking the flow, level, pressure or other variables of liquids or gases (for example, flow meters, level gauges, manometers, heat meters), excluding instruments and apparatus of heading 9014, 9015, 9028 or 9032; parts and accessories thereof: Other instruments and apparatus: Electrical," a provision which has been duty free since at least 2017. *See* Pl. Br. at 2.

The parties do not dispute the details regarding the actual functioning of the Probe or the SCU, or how the Smart NOx Sensor operates in the system to control vehicle emissions. However, as reflected in plaintiff's briefing, Continental oversimplifies or omits certain specifics regarding the operation of its device in an effort to establish its claimed classification, and argues that the Smart NOx Sensor (or its Probe) only measures, and does not perform gas analysis. *See* Pl. Br. at 3. A comprehensive review of the Smart NOx Sensor Probe's functions shows that it is specifically designed for gas analysis, and that it conducts such analysis through the process of chemical analysis—according to the plain meaning of the term from an encyclopedia, as defined

in the field of analytical chemistry, and pursuant to precedential case law and Explanatory Note 90.27—of the exhaust gases that travel through the Probe. Therefore, the Smart NOx Sensor Probe is properly classified as an instrument or apparatus for chemical analysis under heading 9027, HTSUS, and more specifically as a gas analysis apparatus under subheading 9027.10.20, HTSUS.

## PROCEDURAL BACKGROUND

Prior to the time of the importations at issue in this case, Continental imported its Smart NOx Sensors (or earlier versions thereof) under subheading 9027.10.20, HTSUS, in accordance with CBP ruling NYJ88011, dated September 11, 2003. Def. Ex. 1. That ruling classified various types of sensors, including NOx sensors, under subheading 9027.10.20, HTSUS. *Id.* On August 1, 2014, Continental made a request for internal advice related to the classification of its Smart NOx Sensor. Def. Ex. 2, at CTLNOX0132. In that request, Continental contended that the Smart NOx Sensor is properly classified under subheading 9026.80.20, HTSUS.

Subsequently, on July 11, 2016, CBP published HQ H262310, holding that Continental's NOx Sensor is properly classifiable under subheading 9027.10.20, HTSUS. Def. SOF, ¶ 2; Pl. Add. Tab 5. At the time of the importations of the merchandise at issue in this case in 2017, however, Continental imported the Probes with the accompanying wire harnesses. Applying the reasoning of the ruling to the importation of the Probes with accompanying wire harnesses, CBP classified the imports under subheading 9027.10.20 at the 2017 rate of 1.2 percent *ad valorem.*[1]

## STATEMENT OF FACTS

The Smart NOx Sensor Probe is a complex apparatus. Def. SOF, ¶ 6; *see also* Def. Ex. 2, CTLNOX0203. NOx sensor probes, such as plaintiff's Smart NOx Sensor Probe, incorporate

---

[1] Since 2020, the tariff rate for subheading 9027.10.20 has been duty-free.

sophisticated, high-temperature electrochemical cells capable of analyzing the concentration of oxides of nitrogen (comprised of nitric oxide (NO) and nitrogen dioxide (NO$_2$), referred to together as NOx) in the low parts per million (ppm) range. Def. SOF, ¶¶ 6, 16. Following importation, the Smart NOx Sensor Probe is incorporated into Continental's Smart NOx Sensor, which is used in selective catalytic reduction (SCR) systems in passenger vehicles and trucks to reduce harmful NOx emissions through a process involving the controlled introduction of urea, which hydrolyzes (breaks down by reacting with water) in the exhaust system to ammonia (NH$_3$). Def. SOF, ¶¶ 3–4. In the presence of a catalyst within the SCR system, NH$_3$ reduces NOx in the exhaust gas to nitrogen (N$_2$) and water. *Id.*, ¶ 4. This technology has been enabled by the development of NOx sensors for determining elemental oxygen (O$_2$) concentration at the inlet and NOx concentrations at the inlet and outlet of the SCR unit. *Id.*, ¶ 5. Together, both sensors enable onboard diagnostics, showing that standards for the control of NOx pollution are met. *See id.*

Continental's Smart NOx Sensors consist of the Smart NOx Sensor Probe, the accompanying connecting harness, and the SCU. *Id.*, ¶¶ 1, 3, 14. The Smart NOx Sensor Probe, as explained in more detail below, chemically separates O$_2$ and NOx from the other gases in the exhaust, detects and identifies the O$_2$ and NOx, determines the quantity of each of these gases by generating electrical signals that are proportional to the gases' concentrations, and reports the signals to a computer, the SCU, for processing. *Id.*, ¶¶ 6, 14. The harness contains wires that connect the Probe to the SCU. *Id.*, ¶ 15. The SCU strengthens the signals from the Probe and communicates them to the ECU (not a component of the Smart NOx Sensor), where concentrations are calculated in ppm. *Id.*

The Smart NOx Sensor Probe analyzes the concentrations of NOx and $O_2$ through a series of electrochemical reactions that take place in the chambers (cavities) of the probe element. *Id.*, ¶¶ 7, 8. The miniature tip of the probe element contains cavities with electrochemical cells, which consist of electrodes ███████████████████████████ ████████████████████████), made of platinum (Pt) or Pt alloy, that are in contact with layers of solid zirconia (zirconium oxide, $ZrO_2$) (yellow background). *Id.*, ¶¶ 8–9. Zirconia is an electrolyte that allows for movement of oxygen ions ($O^{2-}$), electrically charged atoms, at 800°C, the operating temperature of the Probe (maintained by the heater in Figure 2). Def. SOF, ¶ 9.



**Figure 2**

The electrochemical cells in the probe operate as electrochemical oxygen pumps, which "pump" electrically charged oxygen atoms ($O^{2-}$ ions) through the zirconia electrolyte and out of the electrochemical cells. Def. SOF, ¶ 10. The $O^{2-}$ ions are produced via dissociation of $O_2$ and NOx on Pt and Pt-alloy electrodes. *Id.* During operation, exhaust gas—which is comprised of residual $O_2$, NOx, nitrogen, water vapor, carbon dioxide, carbon monoxide and hydrocarbons— passes through a catalyst and into the first cavity of the Probe. *Id.*, ¶¶ 10, 12. There, $O_2$ is dissociated $O^{2-}$ ions on an electrode that is selective for $O_2$ and is electrochemically pumped out

of the exhaust gas through the zirconia electrolyte.  *Id.*  The removal of $O_2$ generates an electric current signal (in units of milliamperes, for example) proportional to the concentration of $O_2$ and reduces interference from free $O_2$ during NOx quantification.  *Id.*, ¶¶ 10–12.  After $O_2$ has been removed or reduced in the first cavity, the exhaust gas diffuses into the second cavity, which contains an electrode that is designed to selectively dissociate NOx to nitrogen and $O^{2-}$ ions and electrochemically pump the $O^{2-}$ ions from the cavity.  *Id.*  The dissociation of NOx and the concomitant removal of the $O^{2-}$ ions through the zirconia electrolyte generates an electric current signal that is proportional to the NOx present in the exhaust gas.  *Id.*

These electrochemical reactions in the electrochemical cells of the probe element thus allow for the quantitative identification and detection of $O_2$ and NOx by separating components of the exhaust gas and generating electric current signals that are proportional to the concentrations of $O_2$ and NOx in the exhaust gas.  Def. SOF, ¶ 6.  Additional information, such as gas pressure, is needed to further process the milliampere data (the raw data) generated by the Probe, and thus to mathematically convert this raw data into units of concentration for $O_2$ and NOx in ppm; conversion of the probe's current signals to ppm thus occurs outside the Smart NOx Sensor (in the ECU).  Def. SOF, ¶ 14.

In sum, the Smart NOx Sensor Probe itself chemically separates $O_2$ and NOx from the other gases in the exhaust, identifies and detects the $O_2$ and NOx, quantifies each of these gases by generating electrical signals proportional to their concentrations, and reports these signals to a computer, the SCU, which strengthens the concentration signals from the Probe and communicates them to the ECU, where concentrations are calculated in ppm with an accuracy of +/- 10 ppm.  Def. SOF, ¶¶ 6, 14, 16.

## QUESTIONS PRESENTED

1.   Whether the imported Smart NOx Sensor Probes are properly classified as a gas or smoke analysis apparatus under subheading 9027.10.20, HTSUS, which covers "[i]nstruments and apparatus for physical or chemical analysis (for example, … gas or smoke analysis apparatus) …: Gas or smoke analysis apparatus," or

2.   Whether the imported merchandise is properly classified as "[i]nstruments and apparatus for measuring or checking the flow, level, pressure or other variables of liquids or gases …: Other instruments and apparatus: Electrical" under subheading 9026.80.20, HTSUS.

## SUMMARY OF ARGUMENT

The undisputed facts confirm that the Smart NOx Sensor Probe (Probe for short) is correctly classified as a gas or smoke analysis apparatus under subheading 9027.10.20, HTSUS, which covers "instruments and apparatus for physical or chemical analysis" including "gas or smoke analysis apparatus," and that Continental has failed to meet its burden to show otherwise.

First, the Probe electrochemically separates $O_2$ and NOx from the exhaust gas, identifies and detects $O_2$ and NOx, and conducts quantitative analysis of $O_2$ and NOx by electrochemical pumping of negatively charged oxygen ions, which sets up electric currents proportional to the $O_2$ and NOx concentrations present in the exhaust gas. These functions describe an instrument or apparatus for chemical analysis, according to the tariff headings, reference sources, case law, and the exemplars listed in heading 9027, and plaintiff's arguments to the contrary are without support. Moreover, plaintiff's own (though incomplete) description of the merchandise, which describes the Probe as generating an electric signal produced by oxygen ions that correlates to "the concentration of NOx present in the exhaust," Pl. SOF, ¶ 10, shows that the Smart NOx Sensor Probe's functions meet the plain meaning of the term "chemical analysis." Further, the

Government's expert, with more than 50 years of experience in the field of catalysis, including related oxygen sensors, has opined that, in his experience and supported by multiple academic sources, the Probes conduct chemical analysis as defined in the field of analytical chemistry.

Second, classifying the Probe as a gas or smoke analysis apparatus under subheading 9027.10.20 is consistent with the guidance imparted by the explanatory notes (ENs) for heading 9027. The Probe both directly and indirectly "determines and measures the content" of gases such as oxygen and nitric oxide, pursuant to EN 90.27(8). Moreover, EN 90.27(8)(viii) almost exactly describes the design and functions of the Probe, as it provides for "electrochemical reaction in cells with solid (especially zirconium oxide for oxygen analysis) or liquid electrolytes."

Third, the Probe is not properly classified under subheading 9026.80.20, HTSUS, because the merchandise is not for "measuring or checking the flow, level, pressure or other variables of liquids or gases." Further, the phrase "other variables" from heading 9026 does not include "chemical composition," pursuant to its exclusion by EN 90.26(d), its inclusion in heading 9027 through EN 90.27(8), and the analogous exclusion from heading 9026 of other variables that are only "measured or checked" through their explicit inclusion in heading 9027.

Finally, the analysis of ruling H262310, which classified Continental's NOx Sensor under heading 9027, is consistent with the established framework for tariff classification and classifying merchandise pursuant to the plain meaning of the tariff statute. Plaintiff's reliance on various inapposite administrative rulings to support its position is misguided.

## ARGUMENT

### I.    STANDARD OF REVIEW

Under USCIT Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." USCIT Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). On a motion for summary judgment, the Court determines whether there are any factual disputes that are material to the resolution of the action. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Texas Apparel Co. v. United States*, 698 F. Supp. 932, 934 (Ct. Int'l Tr. 1988), *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990) (citations omitted). "The court may not resolve or try factual issues on a motion for summary judgment." *Phone-Mate, Inc. v. United States*, 690 F. Supp. 1048, 1050 (Ct. Int'l Tr. 1988), *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989) (citation omitted). In determining whether a genuine issue of fact exists, the Court reviews the evidence submitted, drawing all inferences against the moving party. *See United States v. Pan Pac. Textile Group Inc.*, 276 F. Supp. 2d 1316, 1319 (Ct. Int'l Tr. 2003); *Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This Court may resolve a classification issue by means of summary judgment. *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998). Summary judgment is appropriate where the nature of the merchandise is not in question and the sole issue before the court is the proper classification of the merchandise. *See id*. In the absence of genuine factual issues, the propriety of summary judgment turns on the proper construction of the HTSUS, which is a question of law. *See Clarendon Marketing, Inc. v. United States*, 144

F.3d 1464, 1466 (Fed. Cir. 1998).  Here, there are no facts in dispute to preclude summary

judgment in favor of the Government.

Moreover, by law, CBP's classification decisions are entitled to a presumption of

correctness.  *See* 28 U.S.C. § 2639(a)(1) (classification decision "is presumed to be correct. The

burden of proving otherwise shall rest upon the party challenging such decision.").  Where, as

here, a plaintiff challenges CBP's classification decision, "a court presumes that Customs applied

the provision correctly, which means that the plaintiff is left with the burden of showing by a

preponderance of the evidence that Customs' decision was incorrect." *ABB, Inc. v. United*

*States*, 346 F. Supp. 2d 1357, 1364 (Ct. Int'l Trade 2004); *see also Saab Cars USA, Inc. v.*

*United States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006).

Notwithstanding the presumption of correctness, the Court "must consider whether the

government's classification is correct, both independently and in comparison with the importer's

alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).  Although

the Court must satisfy itself that CBP's classification is correct, plaintiff still must overcome the

presumption of correctness and provide sufficient evidence to prove that CBP's classification is

incorrect.  *See Jarvis Clark Co. v. United States*, 739 F.2d 628, 630 (Fed. Cir. 1984).

## II.    THE SMART NOx SENSOR PROBE IS PROPERLY CLASSIFIED UNDER SUBHEADING 9027.10.20, HTSUS, BECAUSE IT IS AN ELECTRICAL GAS ANALYSIS APPARATUS

### a.   General Rules of Interpretation

Merchandise imported into the United States is classified under the HTSUS.  The tariff

classification of merchandise under the HTSUS is governed by the principles set forth in the

General Rules of Interpretation (GRIs) and the Additional U.S. Rules of Interpretation.  *See*

*Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998); *BASF Corp. v. United States*, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007).

GRI 1 provides, in relevant part, that "for legal purposes, classification shall be determined according to the terms of the headings and any relative Section or Chapter Notes and, provided such headings or Notes do not otherwise require, according to the {remaining GRIs.}" As interpreted by its Explanatory Note, GRI 1 establishes that "the terms of the headings and any relative section or Chapter Notes are paramount, *i.e.*, they are the first consideration in determining classification." *See also The Pomeroy Collection, Ltd. v. United States*, 559 F. Supp. 2d 1374, 1385 (Ct. Int'l Trade 2008). GRI 6 extends the principles of GRI 1 to the subheading level. The HTSUS section and chapter notes "are not optional interpretive rules," but instead have the force of statutory law. *Aves. In Leather, Inc. v. United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005) (internal quotation marks omitted).

It is well-established that the determination of whether a particular product falls within a tariff classification is a two-step process: first, the meaning of terms within the provision must be ascertained, and second, a determination must be made as to whether the merchandise at issue falls within the description of such terms as properly construed. *See Nat'l Advanced Sys. v. United States*, 26 F.3d 1107, 1109 (Fed. Cir. 1994). "When there is no dispute as to the nature of the merchandise, then the two-step classification analysis 'collapses entirely into a question of law.'" *Link Snacks, Inc. v. United States*, 742 F.3d 962, 965-66 (Fed. Cir. 2014) (quoting *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).

Where, as here, relevant terms are undefined in the tariff statute, they "are {to be} construed according to their common {and} commercial meanings." *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011) (internal quotation marks omitted). To ascertain

the "common {and} commercial meanings" of a particular tariff term, the Court "may rely on its own understanding of the term as well as upon lexicographic and scientific authorities." *Len-Ron Mfg. Co., Inc. v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  That is, the "court may consult dictionaries, scientific authorities, and other reliable information sources." *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

### b.   The Smart NOx Sensor Probe Is an Instrument or Apparatus for "Chemical Analysis," Identified in Heading 9027

The question presented is whether Continental's Smart NOx Sensor Probe is an instrument or apparatus for "chemical analysis" under heading 9027, and more specifically, as an electrical "[g]as or smoke analysis apparatus" under subheading 9027.10.20, HTSUS. The definitions, case law, and undisputed facts demonstrate that they do, and Continental has not met its burden to show otherwise.

Subheading 9027.10.20, HTSUS, provides for "[i]nstruments and apparatus for physical or chemical analysis (for example, polarimeters, refractometers, spectrometers, gas or smoke analysis apparatus); instruments and apparatus for measuring or checking viscosity, porosity, expansion, surface tension or the like; instruments and apparatus for measuring or checking quantities of heat, sound or light (including exposure meters); microtomes; parts and accessories thereof: Gas or smoke analysis apparatus: Electrical."

Both parties agree that the Smart NOx Sensor Probes qualify as instruments or apparatus. Pl. Br., at 8-9, 15.  An "instrument," as relevant to this case, is defined as an "implement, especially: one designed for precision work," or as "a measuring device for determining the present value of a quantity under observation."  Def. Ex. 5, at 9, *available at* https://www.merriam-webster.com/dictionary/instrument  (last viewed Dec. 13, 2021). Similarly, an "apparatus," as relevant to this case, is defined as "a set of materials or equipment

23

designed for a particular use," or "an instrument or appliance designed for a specific operation." Def. Ex. 5, at 1, *available at* https://www.merriam-webster.com/dictionary/apparatus (last viewed Dec. 13, 2021). The facts of this case show that the Smart NOx Sensor Probes meet both of these definitions, and the classification provisions advanced by both parties (headings 9027 and 9026) employ the terms "instrument[]" and "apparatus." Therefore, there is no dispute that the Probes meet these terms. We next discuss the term "chemical analysis" from heading 9027.

### i.   "Chemical Analysis" Means Determining the Physical Properties or Chemical Composition of Something

The term "chemical analysis" is not defined in the tariff. Encyclopedia Britannica defines "chemical analysis" as the "determination of the physical properties or chemical composition of samples of matter." Def. Ex. 5 at 3, *available at* https://www.britannica.com/science/chemical-analysis (last viewed Dec. 3, 2021). Prior decisions interpreting the Tariff Schedules of the United States (TSUS), the predecessor statute to the HTSUS, provide further guidance as to the meaning of the term. The U.S. Court of Appeals for the Federal Circuit has stated that Congress intended that decisions under a prior nomenclature "should be considered instructive in interpreting the HTSUS, *particularly where the nomenclature previously interpreted in those decisions remains unchanged and no dissimilar interpretation is required by the text of the HTSUS*." *See JVC Co. of Am. v. United States*, 234 F.3d 1348, 1355 (Fed. Cir. 2000) (quoting H.R. Conf. Rep. No. 100-576, at 549-50 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582-83) (emphasis added).

With respect to this case, Schedule 7, Part 2, Subpart D: Item 711.88 of the TSUS contained similar language to Subheading 9027.10.20 of the HTSUS. Specifically, Item 711.88 provided for, "Polarimeters, refractometers, spectrometers, gas analysis apparatus and other

instruments or apparatus for physical or chemical analysis . . . all the foregoing, and parts thereof: 711.88 Other."

In *Burrows Equipment Co. v. United States,* 300 F. Supp. 455, 458 (1969), the Customs Court discussed the meaning of "instruments or apparatus for physical or chemical analysis" and held as follows:

> An instrument or apparatus is included within the common meaning of the term 'chemical analysis' if it determines one or more ingredients of a substance either as to kind or amount; or if it performs a detailed examination of a complex chemical substance for the purpose of enabling one to understand its nature or to determine an essential feature; or if it determines what elements are present in a chemical substance.

300 F. Supp. at 458. In that case, the Court considered whether a vitascope (an instrument for determining the germinating capacity of seeds) was properly classified under TSUS item 711.88. *Id.* at 455-56. In defining the term "analysis" for purposes of the TSUS, the Court held as follows:

> The vitascope clearly performs an 'analysis' within the common meaning of that term. For it determines rapidly the germinability of seed by ascertaining whether or not the seed contains enzymes. As we have seen, in the operation of the vitascope, if enzymes are present, they react upon contact with the tetrazolium solution to release hydrogen which turns the tetrazolium into a red formalazine. Thus, the vitascope accomplishes its function by detecting the presence or absence of enzymes in a particular sample of seed— which in turn indicates whether or not the seed is germinable.

*Id.* at 458.

Similarly, in *Pharmacia Fine Chemicals, Inc. v. United States*, 9 CIT 438, 441 (Ct. Int'l Trade 1985), the Court of International Trade held that "instruments or apparatus for physical or chemical analysis" of TSUS item 711.88 describes articles that are "chiefly used to perform or facilitate physical or chemical determination of the quantity, qualities, or composition of a

substance." 9 CIT at 441. The issue in *Pharmacia* was whether "columns," "adaptors,"
"reservoirs," "tubing connectors," and "fraction collectors" were properly classified under item
711.88, TSUS, as "instruments or apparatus for physical or chemical analysis." *Id*. at 438. The
Court found that the imported merchandise was "chiefly used for filtering or purifying liquids."
*Id*. at 439. The Court cited the definition of "chemical analysis" used in *Burrows*, but found that
the merchandise in the case did not meet the definition of "chemical analysis." *Id*. at 440-41.
Instead, the Court held that the merchandise was properly classifiable as "filtering and purifying .
. . apparatus . . . for liquids" under item 661.95, TSUS, because the merchandise was chiefly
used for filtering or purifying liquids and merely separated materials to obtain a purified
substance, and such separation was not for subsequent analysis. *Id*.

      The terms of the TSUS analyzed in *Burrows* and *Pharmacia*, "chemical analysis" and
"instruments or apparatus for physical or chemical analysis," included in item 711.88, TSUS, are
virtually the same as the language in heading 9027, HTSUS, "[i]nstruments and apparatus for
physical or chemical analysis." *Burrows*, 300 F. Supp. at 458; *Pharmacia*, 9 CIT at 438.
Consequently, aside from one nuance,[2] the interpretation of the HTSUS in this action does not
require a dissimilar interpretation as compared to the TSUS. *Burrows*, 300 F. Supp. at 458;
*Pharmacia*, 9 CIT at 438; *see also JVC*, 234 F.3d at 1355.

      Taken together, the above legal authorities show that the common meaning of "chemical
analysis" is determining the physical properties or chemical composition of something. It is the

---

[2] The legal framework of "chief use" was discontinued when the TSUS was discontinued.
*Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature
Structure of the Harmonized System: Submitting Report* at 34-35 (USITC Pub. No. 1400) (June
1983).

act of performing or facilitating the physical or chemical determination of the quantity, qualities, or composition of a substance.

Finally, consistent with the dictionary definition and the case law discussed above, defendant's expert Dr. Calvin Bartholomew, with more than 50 years of experience in the fields of analytical chemistry and catalysis, including oxygen sensors which are related to NOx sensors, has explained that analytical chemistry includes the disciplines of qualitative and quantitative analysis, *i.e.*, identification of species and determination of the quantities of species. Def. Ex. 3, at 6, and Tab B at 7. Both disciplines are within the realm of chemical analysis. *Id.* A definition widely used and accepted in the field of analytical chemistry for "chemical analysis" involves three elements: (1) separate, (2) identify or detect, and (3) quantify. Def. Ex. 3, at 6, and Tab A at 4; *see also Warner-Lambert*, 407 F.3d at 1209 (To ascertain the common and commercial meanings of a particular tariff term, the "court may consult dictionaries, scientific authorities, and other reliable information sources."). The elements of chemical analysis are evident in the functions of the Smart NOx Sensor's Probe, further described below. Def. Ex. 3, at 6, and Tab B at 7.

### ii. The Smart NOx Sensor Probe Performs the Function of Chemical Analysis

Here, the Smart NOx Sensor Probe's complex function fits under each of the definitions of "chemical analysis" described above. The Probe is an instrument or apparatus for chemical analysis of $O_2$ and NOx concentrations in exhaust gas mixtures from diesel engines. *See* Def. SOF, ¶ 6. As will be explained in further detail below, the chemical separation, identification, detection, and quantification of $O_2$ and NOx performed by the Probe qualifies as chemical analysis under all the definitions above. *Id.*, ¶¶ 6, 12, 13.

The Smart NOx Sensor Probe's functions meet Dr. Bartholomew's definition of chemical analysis. The three elements of separation, identification or detection, and quantification are evident in chemical analysis by the Probe. *See* Def. SOF, ¶¶ 6, 12, 13; Def. Ex. 3, at 6. First, the Probe separates $O_2$ and NOx from an exhaust gas mixture. Def. SOF, ¶ 12. The exhaust gas mixture analyzed by the Probe consists of $O_2$, NOx, nitrogen, water vapor, carbon dioxide, carbon monoxide, and hydrocarbons. *Id.*, ¶ 12. As the exhaust gas mixture enters the first cavity of the Probe, the Probe electrochemically pumps $O_2$ out of the exhaust gas mixture using two electrochemical cells with Pt electrodes powered at a voltage that selectively dissociates $O_2$ into $O^{2-}$ ions. *Id.*, ¶¶ 9-10. Once dissociated, the $O^{2-}$ ions move out of the electrochemical cells through the zirconia electrolyte. *Id.*, ¶ 10. The separation of $O_2$ from the exhaust gas mixture is necessary for quantification of $O_2$ and to avoid interference with quantification of NOx. *Id.*, ¶ 12. After removal of $O_2$ at the first two electrochemical cells, the remaining exhaust gas mixture diffuses to the third electrochemical cell in the Probe, which contains an electrode composed of a Pt alloy that separates NOx from the exhaust mixture by (a) selectively reducing any $NO_2$ in the NOx mixture to NO and (b) dissociating NO into nitrogen atoms (which recombine to nitrogen molecules $N_2$) and $O^{2-}$ ions while (c) removing the dissociated $O^{2-}$ ions via electrochemical pumping through the zirconia electrolyte. *Id.*, ¶¶ 12-13; *see* Figure 2, *supra* in Statement of Facts; *see also* Def. Ex. 2, at CTLNOX2164.

Second, the Probe quantitatively detects $O_2$ and NOx. As stated above, the Probe uses two electrochemical cells that selectively dissociate $O_2$ into $O^{2-}$ ions, as well as a third electrochemical cell that selectively dissociates NOx into nitrogen atoms and $O^{2-}$ ions. Def. SOF, ¶¶ 12-13. Upon dissociation, the $O^{2-}$ ions move out of the electrochemical cells through the zirconia electrolyte, which sets up electric currents that are proportional to the concentrations

of $O_2$ and NOx, respectively, in the exhaust gas mixture. Def. SOF, ¶¶ 10-11. After $O_2$ has been separated from the other components of the exhaust gas stream by the first two electrochemical cells, the remaining exhaust gas mixture diffuses to the third electrochemical cell in the Probe. *Id.*, ¶¶ 12-13. This cell contains an electrode composed of a Pt alloy that selectively reduces $NO_2$ in the NOx mixture to NO and dissociates NO into nitrogen and $O^{2-}$. *Id.*, ¶¶ 9-13. The dissociated $O^{2-}$ ions from NO molecules move out of the electrochemical cells through the zirconia electrolyte, which sets up an electric current that is proportional to the concentration of NOx. *Id.*, ¶¶ 10-11. In this manner, the Probe also achieves the third element of the definition of chemical analysis by providing the raw data for converting the $O_2$ and NOx concentrations into ppm.

In sum, the Probe with its electrochemical cells performs all three elements of classical chemical analysis: (1) electrochemical separation of $O_2$ and NOx from the exhaust gas; (2) identification and detection of $O_2$ and NOx in the exhaust gas; and (3) quantitative analysis of $O_2$ and NOx by electrochemical pumping of $O^{2-}$ ions, setting up currents proportional to $O_2$ and NOx concentrations. *Id.*, ¶ 7.

Given the preceding description of the Smart NOx Sensor Probe's functions, it also clearly meets the Encyclopedia Britannica definition of "chemical analysis" because it "determines the chemical composition" of the exhaust gas by generating electric current signals proportional to $O_2$ and NOx concentrations, which can be converted into concentrations in ppm. *Id.*; Def. Ex. 5, at 3.

The Smart NOx Sensor Probe's functions also meet the definition of "chemical analysis" articulated in *Burrows* because the sensor "determines one or more ingredients of a substance either as to kind or amount." 300 F. Supp. at 455. In fact, not only does the Probe determine the

kinds of ingredients or components in the exhaust gas—$O_2$ and NOx—but it also determines them as to their amount by providing electric current signals proportional to $O_2$ and NOx concentrations, which can be converted into concentrations in ppm. Def. SOF, ¶ 7. Moreover, the Probe also meets the definition articulated in *Burrows* because it "determines what elements are present in a chemical substance," as it specifically separates and detects $O_2$ and NOx among all the components in the exhaust gas ($O_2$, NOx, nitrogen, water vapor, carbon dioxide, carbon monoxide, hydrocarbons). *Id.*, ¶ 9; 300 F. Supp. at 455.

The Smart NOx Sensor Probe also meets the definition of "chemical analysis" set forth in *Pharmacia* because it is "chiefly used to perform or facilitate physical or chemical determination of the quantity, qualities, or composition of a substance." 9 CIT at 441.[3]  By plaintiff's own description of the merchandise, "[w]hen the electrode comes into contact with NOx, a reaction occurs which dissociates oxygen from nitrogen and generates an electrical signal produced by oxygen ions that correlates to *the concentration of NOx present in the exhaust*." Pl. SOF, ¶ 10 (emphasis added). Although we view this description of the merchandise by plaintiff to be incomplete as it fails to describe all the complex processes that take place in the Smart NOx Sensor Probe's electrochemical cells, plaintiff's description nonetheless shows that the Probe "performs . . . chemical determination of the quantity . . . or composition of a substance" because the Probe separates, identifies, detects, and quantifies NOx as a component in the exhaust gas. Def. SOF, ¶¶ 7, 13; *Pharmacia*, 9 CIT at 441.  More specifically, the undisputed facts show that the Probe detects $O_2$ and NOx in the exhaust gas, which qualifies as performing the chemical determination of the composition ($O_2$ and NOx) of a substance (exhaust gas), and performs

---

[3] Again, the concept of chief use is not relevant or operative for interpreting the HTSUS. *Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System: Submitting Report* at 34-35 (USITC Pub. No. 1400) (June 1983).

quantitative analysis of $O_2$ and NOx by electrochemical pumping of $O^{2-}$ ions, setting up currents proportional to $O_2$ and NOx concentrations, which qualifies as performing the chemical determination of the quantity (concentrations) of a substance ($O_2$ and NOx). *Id.*

In short, the Smart NOx Sensor Probe performs the function of "chemical analysis," pursuant to the plain meaning of those terms, and is therefore classified in heading 9027.

### c. The Smart NOx Sensor Probe Is an Electrical "Gas or Smoke Analysis Apparatus," Identified *Eo Nomine* in Subheading 9027.10.20

Subheading 9027.10.20, HTSUS, provides for electrical "Gas or smoke analysis apparatus." Similarly, heading 9027 identifies the exemplar of "gas or smoke analysis apparatus[.]" The undisputed facts show that the Smart NOx Sensor Probe is an electrical gas analysis apparatus.

We could not locate a dictionary definition for "gas analysis apparatus." However, the explanatory notes to heading 9027 (EN 90.27) provide a detailed description of the term. "After consulting the [H]eadings and relevant section or chapter notes" consistent with GRI 1, the Explanatory Notes (ENs) attendant to the relevant HTSUS Headings may be considered. *Fuji Am. Corp. v. United States*, 519 F.3d 1355, 1357 (Fed. Cir. 2008) (citation omitted). The World Customs Organization publishes the ENs as its "official interpretation of the Harmonized Commodity Description and Coding System," the "global system of trade nomenclature on which the HTSUS is based." *Kahrs International, Inc. v. United States*, 713 F.3d 640, 644 n.2 (Fed. Cir. 2013); *Michael Simon Design, Inc. v. United States*, 637 F. Supp. 2d 1218 (Ct. Int'l Trade 2009) (discussing the HTSUS's historical backdrop). The ENs provide persuasive guidance and "are generally indicative of the proper interpretation," though they do not constitute binding authority. *Kahrs*, 713 F.3d at 645 (citations omitted).

31

In this case, EN 90.27 provides, in pertinent part:

> (8)  Gas or smoke analysis apparatus. These are used to analyze combustible gases or combustion by-products (burnt gases) in coke ovens, gas producers, blast furnaces, etc., in particular, for determining their content of carbon dioxide, carbon monoxide, oxygen, hydrogen, nitrogen or hydrocarbons. Electrical gas or smoke analysis apparatus are mainly for determining and measuring the content of the following gases: carbon dioxide, carbon monoxide and hydrogen, oxygen, hydrogen, sulphur dioxide, ammonia.
> …
> Other models work on the basis of density, or by fractional condensation and distillation (cracking), or on the following principles:
> …
> (viii) Electrochemical reaction in cells with solid (especially zirconium oxide for oxygen analysis) or liquid electrolytes.

Similar to the description of "gas or smoke analysis apparatus" reflected in the explanatory notes, we located a definition for an "exhaust-gas analyzer," from *A Dictionary of Mechanical Engineering* (2019) by Oxford Reference, which is defined as follows:

> An instrument used to determine the composition of the exhaust gas from an engine both to check whether regulated emissions (unburned hydrocarbons (UHC), carbon monoxide (CO), and oxides of nitrogen (NOx)) are within allowable limits and also to analyse engine performance. The analysis methods used include: a flame ionization detector (UHC); a non-dispersive infrared detector (carbon dioxide and CO); a chemiluminescent analyser (NOx).

Def. Ex. 5, at 5, *available at* https://www.oxfordreference.com/search?q=exhaust+gas+analyser&searchBtn=Search&isQuickSearch=true&print (last viewed Dec. 13, 2021).

The Smart NOx Sensor Probe meets both the description of the explanatory notes and the common meaning of the term "exhaust-gas analyzer."

First, as shown above in Part II.b.ii, the Probe conducts chemical analysis of the exhaust gas that passes through it. Specifically, the Probe determines the concentration of $O_2$ and NO in exhaust gas entering and exiting the SCR system through a multi-step process that includes (1) electrochemical separation of $O_2$ and NOx from the exhaust gas; (2) identification and detection of $O_2$ and NOx in the exhaust gas; and (3) quantitative analysis of $O_2$ and NOx by electrochemical pumping of $O^{2-}$ ions, setting up currents proportional to $O_2$ and NOx concentrations. Def. SOF, ¶ 7. In the definition of exhaust-gas analyzer above, NOx is even specifically mentioned as a gas that the device analyzes, exactly like the Smart NOx Sensor Probe. As such, the Probe analyzes the exhaust gas that passes through it, and thus clearly matches the term "gas analysis apparatus" contained in the tariff.

Although the terms "Gas or smoke analysis apparatus" and "exhaust-gas analyzer" are slightly different in their words, they are effectively the same item. The former is described as a device for "determining and measuring the content of the following gases: carbon dioxide, carbon monoxide and hydrogen, oxygen, hydrogen, sulphur dioxide, ammonia," and the latter is similarly described as being used to "determine the composition of the exhaust gas," including one of the same exemplar gases listed for gas or smoke analysis apparatus (carbon monoxide). Moreover, as the EN states, gas analysis apparatus are used to analyze combustible gases or combustion by-products. Exhaust gas is created in passenger vehicles and trucks after fuel is combusted. *See* Def. SOF, ¶ 4. Hence, exhaust gas is a combustion by-product. As discussed above, an "exhaust-gas analyzer" is a type of gas analysis apparatus, and is used to determine the composition of the exhaust gas to check whether regulated emissions, such as oxides of nitrogen (NOx), are within allowable limits. *See id.*, ¶¶ 4-5. Further, "gas analysis apparatus" such as exhaust-gas analyzers includes oxygen (Ox) sensors as well as NOx sensors. *See* Def. Ex. 5, at

33

5; Def. Ex. 3, Tab A at 6. "Present-day Ox and NOx sensors are sophisticated, high-temperature electrochemical cells capable of analysis of $O_2$ and NOx concentrations in the low ppm range, consistent with their classification as analytical instruments for determining gas concentrations chemically." Def. Ex. 3, Tab A at 6-7.

Consequently, the Smart NOx Sensor Probe, and for that matter, the Smart NOx Sensor, matches the EN's description as a gas analysis apparatus "used to analyze combustible gases or combustion by-products" because it is used to chemically analyze the exhaust gas. EN 90.27(8); Def. SOF ¶ 7. In fact, exhaust gas is specifically composed of oxygen, NOx, nitrogen, water vapor, carbon dioxide, carbon monoxide, and hydrocarbons, and most of these component substances match the exemplar component substances listed in EN 90.27(8). Def. SOF, ¶ 12. Moreover, it is also used for determining the exhaust gas's "content of carbon dioxide, carbon monoxide, oxygen, hydrogen, nitrogen *or* hydrocarbons," because it is specifically used to determine the concentration of oxygen and NOx in the exhaust gas. EN 90.27(8) (emphasis added); Def. SOF ¶¶ 7, 9. But the EN describes the Smart NOx Sensor Probe even more specifically, because NOx sensors are not just "gas analysis apparatus," but more specifically are "electrical gas analysis apparatus," as they employ electricity and electrochemical cells to analyze gases passing through them. *See* Def. SOF ¶¶ 7, 8, 9, 12. In addition, the Probe is both directly and indirectly involved in "determining and measuring the content of" *at least one* of "the following gases: carbon dioxide, carbon monoxide and hydrogen, oxygen, hydrogen, sulphur dioxide, ammonia," because it is specifically used to determine and measure the content (concentration) of oxygen and NOx in the exhaust gas, and because information on the NOx concentration can be used to monitor NOx conversion within the SCR system and detect unconverted ammonia that exits the system ($NH_3$ slip). Def. SOF ¶¶ 5, 7. As such, the

34

undisputed facts show that EN 90.27(8) squarely encompasses the Smart NOx Sensor Probe as an electrical gas analysis apparatus.

In addition, EN 90.27(8)(viii) very closely describes the design and functions of the Smart NOx Sensor Probe. EN 90.27(8)(viii) instructs that heading 9027 includes devices that work on the basis of "[e]lectrochemical reaction in cells with solid (especially zirconium oxide for oxygen analysis) or liquid electrolytes." Here, the Probe quantifies NOx through "electrochemical reaction[s] in cells with solid . . . zirconium . . . electrolyte," and more specifically by the pumping of dissociated oxygen through zirconium electrolyte. Def. SOF, ¶¶ 7, 8; *see also* Def. Ex. 2, at CTLNOX2164. As such, EN 90.27(8)(viii) applies specifically to devices like the Smart NOx Sensor Probe.

Finally, the Smart NOx Sensor Probe undoubtedly performs chemical analysis per the language in 90.27(8) as shown by Continental's own documentation. Per Continental's own documents, the Smart NOx Sensor " ██████████████████████████████████████ ██████████████████████████████████████████████." Def. Ex. 2, at CTLNOX0203. While Continental attempts to downplay the Smart NOx Sensor Probe's abilities in its briefing before the Court, its internal business and pre-litigation documentation indicates otherwise. Continental named its NOx sensor the "Smart NOx Sensor," and ████████ ██████████████████████████████████████. *Id*. at CTLNOX0190, 198-201, 203, 207. The business presentation documentation also boasts that ████████████████████████ ██████████████████████████████████████████████." *Id*. at 201.

In sum, the Smart NOx Sensor Probes are not just "instruments and apparatus for physical or chemical analysis" under heading 9027, HTSUS, but they are specifically electrical "Gas or smoke analysis apparatus," pursuant to the plain meaning of those terms, as well as the

guidance of EN 90.27(8), and is therefore classified in the *eo nomine* provision of Subheading 9027.10.20, HTSUS.

One final note about the interpretation of heading 9027. As we discussed above, the heading covers "[i]nstruments and apparatus for physical or chemical analysis[,]" among other items. The inclusion of the term "for" in this phrase may signify that the heading is a principal use provision. *Compare Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312 (Fed. Cir. 2012) (holding that Heading 2104, insofar as it covers preparations for soups and broths, is a principal use provision), *with Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1164 (Fed. Cir. 2017) (holding that, although Heading 6909 recites the use of ceramic products "for" certain purposes, the operative question was whether the subject merchandise constituted a "ceramic ware" under the Heading's terms, thereby resulting in treating the Heading as *eo nomine*). Here, as in *Schlumberger*, an analysis of the factors of principal use is unnecessary because, as we demonstrated above, the Smart NOx Sensor Probe is an electrical "Gas or smoke analysis apparatus," pursuant to the plain meaning of those terms, and is therefore classified in subheading 9027.10.20, HTSUS, in accordance with an *eo nomine* analysis. 845 F.3d at 1164 ("Heading 6914, which recites 'Other ceramic articles,' is unquestionably *eo nomine* because it describes the articles it covers by name.").

### d. The Smart NOx Sensor Probe Is Similar to the Other Exemplars of Heading 9027

The exemplars listed under heading 9027 of the HTSUS further support classifying the Smart NOx Sensor Probe under this heading. In addition to "gas or smoke analysis apparatus," heading 9027 identifies "polarimeters, refractometers," and "spectrometers," as other examples of "instruments and apparatus for physical or chemical analysis" that are classified in the

heading.  These exemplars are indicative of the types of items that are classified under the heading, and the imported Probe shares many characteristics that are similar to these exemplars.

A polarimeter is "an instrument for determining the amount of polarization of light or the proportion of polarized light in a partially polarized ray." Def. Ex. 5, at 13, *available at* https://www.merriam-webster.com/dictionary/polarimeter (last viewed Dec. 8, 2021).  Further, according to Cole-Parmer, a scientific instruments company based in Illinois,

> Polarimetry measures the rotation of polarized light as it passes
> through an optically active fluid. The measured rotation can be
> used to calculate the value of solution concentrations; especially
> substances such as sugars, peptides and volatile oils.

*Id.*, at 14, *available at* https://www.coleparmer.com/tech-article/principles-of-polarimetry (last viewed Dec. 8, 2021).  Polarimeters offer high accuracies where precision is critical in determining the concentration of samples.  *Id.*

A refractometer is "an instrument for measuring refractive indices (as for identification or the determination of sugar content)."  *Id.*, at 18, *available at* https://www.merriam-webster.com/dictionary/refractometer (last viewed Dec. 8, 2021).  Spectrometer has two definitions: "1: an instrument used for measuring wavelengths of light spectra" and "2: any of various analytical instruments in which an emission (as of particles or radiation) is dispersed according to some property (such as mass or energy) of the emission and the amount of dispersion is measured."  *Id.*, at 19, *available at* https://www.merriam_webster.com/dictionary/spectrometer (last viewed Dec. 8, 2021).

The entry includes an example sentence that uses the term "mass spectrometer," as an example of a type of spectrometer.  *Id.*, at 20.  A search in the same dictionary for "mass spectrometer" yields the entry for the definition of "mass spectrometry," which is

"an instrumental method for identifying the chemical constitution of a substance by means of the separation of gaseous ions according to their differing mass and charge." *Id.*, at 21, *available at* https://www.merriam-webster.com/dictionary/mass%20 spectrometer (last viewed Dec. 8, 2021).

Like a polarimeter, the Smart NOx Sensor Probe is used to calculate the concentration of a sample or substance (NOx concentration in exhaust gas). Def. SOF, ¶ 7. The Probe is also like a refractometer because it identifies or determines the content of a substance (NOx) in another (exhaust gas). *Id.* Likewise, the Probe is similar to a mass spectrometer because the sensor also determines the chemical constitution of a substance, given that the sensor determines the concentration of $O_2$ and NO in exhaust gas entering and exiting the SCR system through a multi-step process that includes (1) electrochemical separation of $O_2$ and NOx from the exhaust gas; (2) identification and detection of $O_2$ and NOx in the exhaust gas; and (3) quantitative analysis of $O_2$ and NOx by electrochemical pumping of $O^{2-}$ ions, setting up currents proportional to $O_2$ and NOx concentrations. *Id.* In sum, all three exemplars have the unifying feature of being used to determine the content of a substance, and the Smart NOx Sensor Probe shares that feature in that it also determines the content of a sample or substance.

### e. Plaintiff's Arguments Involving Heading 9027 Are Unavailing

Plaintiff argues that the Smart NOx Sensor (or its Probe) is not an analytical device. Pl. Br., at 11. Plaintiff is incorrect for the following reasons.

Plaintiff first argues that defendant has admitted that the Smart NOx Sensor has no "analytical capabilities." *Id.* This is incorrect; defendant has not made such a statement. Rather, defendant's expert witness, Dr. Bartholomew, testified that, "The probe *by itself* can do nothing.

It can't measure or analyze." *Id.* (emphasis added). As reflected by the words and context of this sentence, Dr. Bartholomew was referring to the fact that the Probe cannot function without being plugged into the SCU and the rest of a vehicle's electronics. Def. SOF, ¶¶ 11, 14-15. Once plugged in, the Smart NOx Sensor Probe indeed performs chemical analysis. *See id.*, ¶ 7. Any chemical analyzer that runs on electricity, like the Smart NOx Sensor, must be hooked up and plugged in for it to conduct chemical analysis. *See id.*, ¶ 15; Def. Ex. 3, at 8.

Plaintiff next argues that the sensor is not an analytical device because it cannot accurately determine individual components of NOx, and only senses their combined property. Pl. Br., at 11. Plaintiff fails to explain how this particular claim is relevant to the interpretation of heading 9027 and the phrase "instruments or apparatus for physical or chemical analysis." To begin, plaintiff has not provided a definition of "chemical analysis," but only of "analysis." *Id.* at 10. In this respect, plaintiff has disregarded the tariff term "chemical" as part of the phrase "chemical analysis."

Nevertheless, even if only the definition of "analysis" were appropriate here, plaintiff's citation to the Merriam-Webster Online Dictionary definition of "analysis" is incomplete. That dictionary provides seven definitions for the word "analysis." Most relevant to the disputed issues of this case is definition 3.a., which defines the term as "the identification or separation of ingredients of a substance." Def. Ex. 5, at 22, *available at* https://www.merriam-webster.com/dictionary/analysis (last viewed Dec. 20, 2021). This is the most relevant definition for this case because the online dictionary includes an example sentence with this definition, and in that example sentence, the online dictionary employs the phrase chemical analysis. *Id.* The example sentence is as follows: "a chemical *analysis* of the soil." *Id.*

The Smart NOx Sensor or even just the Smart NOx Sensor Probe, would more than satisfy this definition of analysis because it both separates *and* identifies ingredients of a substance, as it electrochemically separates $O_2$ and NOx from the exhaust gas, identifies and detects $O_2$ and NOx in the exhaust gas, and further conducts quantitative analysis of $O_2$ and NOx by electrochemical pumping of $O^{2-}$ ions, setting up currents proportional to $O_2$ and NOx concentrations.  Def. SOF, ¶ 6.

Plaintiff continues by arguing that the Smart NOx Sensor is not an analytical device because it performs no additional processing, and that it does not actuate an alarm, display processing, data log, or accomplish multi-gas discrimination, which plaintiff claims (without legal support or factual evidence) "are all common features of analytical devices."  Pl. Br., at 11. But none of these features are required elements under any of the definitions of "chemical analysis" discussed above, and none are necessary for the Smart NOx Sensor Probe's sufficiently complex functions to constitute chemical analysis.  *See* Part II.b.ii, *supra*; Def. Ex. 3, at 8. Plaintiff further argues that the sensor is not able to measure NO and $NO_2$ individually, is unable to analyze the exhaust gas and distinguish among chemical species as would a gas analyzer, and cannot distinguish ammonia, the active ingredient in the urea being injected, from NO and $NO_2$, which is distinguished by analysis and calculations done in the ECU. Pl. Br., at 11.  But again, these are features that are not required for the Probe's functions ( *i.e.*, separation, identification, detection, and quantification) to qualify as chemical analysis; in other words, the Probe need not perform every function conceived by plaintiff, it need only meet the common meaning of chemical analysis, which is to determine the physical properties or chemical composition of something.  Moreover, none of the definitions require that *all* components or ingredients of a substance be identified or quantified.  *See* Part II.b.ii, *supra*.

Plaintiff next argues that the sensor is not an analytical device because it claims that it is not considered an analytical device in the automotive engineering industry. Pl. Br. at 12. In support of this claim, plaintiff cites the testimony of its expert, John Schuster, a former employee of Continental who was involved with the Smart NOx Sensor and its tariff classification prior to his retention as an expert witness in this litigation. *See* Def. Ex. 6, at 1. However, this testimony offers little guidance because it contains highly generalized statements ("the automotive engineering industry") with no support by any documentary evidence. As such, the Court should credit the plain meaning of the tariff terms over this testimony because the Smart NOx Sensor's, and more particularly, the Probe's functions, as noted in Part II.b.ii, *supra*, squarely satisfy the dictionary, case law, and scientific authority definitions of chemical analysis pursuant to heading 9027.

Next, plaintiff argues that the testimony of defendant's expert, Dr. Bartholomew, undercuts his finding that the Smart NOx Sensor Probe is a device that conducts chemical analysis. Pl. Br. at 13. As background, Dr. Bartholomew's academic and work experience is both extensive and highly relevant to this case. Def. Ex. 3, Tab A, at 22-28. In summary, defendant's expert has over fifty years of experience in chemical engineering, having obtained a B.E.S., a M.S., and a Ph.D., all in Chemical Engineering, from distinguished universities (Brigham Young University (BYU) and Stanford University), and he is a Professor Emeritus of Chemical Engineering at BYU, where he conducted research and teaching for 42 years. Def. Ex. 3, at 1; Tab A, at 22. As such, he has developed a detailed knowledge of issues involved in this litigation, including chemical analysis, analytical tools, selective catalytic reduction, chemical sensors, and especially the functions of Continental's Smart NOx Sensor. Def. Ex. 3, at 1. He also has significant experience in patent evaluation, and has earned a number of awards, honors,

and recognitions for his work. *Id.*, Tab A, at 22-25. He is also a member of a number of professional societies, and has authored or co-authored three dozen scientific publications in just the last ten years. *Id.* at 26-28. Despite this, plaintiff challenges the statements of Dr. Bartholomew by stating that he had never worked with sensors and had not seen a NOx sensor, and that he did not have an understanding of how it worked before he was provided an exemplar. Pl. Br. at 13. While he had indeed not visually *seen* a *NOx* sensor, Dr. Bartholomew had certainly seen, worked with, and, most importantly, understood sensors, as he had previously conducted a large literature study and made a detailed report of the technologies and markets for three-way-catalysts which rely on oxygen sensors, the forerunners of NOx sensors. Def. Ex. 3, Tab A at 3. Further, he stated in his deposition that he understood the principle of the oxygen sensor already, and that he was not making a large inferential leap by describing the Smart NOx Sensor, given that the yttrium zirconia is common to both kinds of sensors. Def. Ex. 10, Depo. Tr., C. Bartholomew, Mar. 19, 2021, 170:19-25. Finally, while Dr. Bartholomew does note that conversion of the raw data produced in the Smart NOx Sensor Probe and enhanced by the SCU occurs in the ECU, *see* Pl. Br. at 13-14, this does not change his opinion that the Probe by itself performs chemical analysis, and more importantly, this does not change the fact that the Probe independently satisfies all of the previously discussed definitions of chemical analysis, because the Probe independently performs chemical analysis through its separation, identification, detection, and quantification processes, even were its raw data output in milliamperes not further refined by the ECU into ppm. *See* Def. SOF, ¶¶ 6-7, 11, 14.

Plaintiff next argues that *Pharmacia* and *Burrows* fail to support classifying the merchandise under subheading 9027.10.20, which is incorrect. Pl. Br., at 14. Plaintiff's review and analysis of the *Pharmacia* case is limited, and does not discuss the definition of "chemical

analysis" that the Court considered in that case. *See id.*; 9 CIT at 441. Plaintiff fails to explain how the phrase "instruments and apparatus for physical and chemical analysis," which describes articles that are "chiefly used to perform or facilitate physical or chemical determination of the quantity, qualities, or composition of a substance," does not apply to the Smart NOx Sensor. Pl. Br., at 14. The undisputed facts show that the Smart NOx Sensor Probe *both* detects $O_2$ and NOx in the exhaust gas—thereby performing the chemical determination of the composition ($O_2$ and NOx) of a substance (exhaust gas)—*and* performs quantitative analysis of $O_2$ and NOx by electrochemical pumping of $O^{2-}$ ions, setting up currents proportional to $O_2$ and NOx concentrations—thereby performing the chemical determination of the quantity (concentrations) of a substance ($O_2$ and NOx). *See* Def. SOF, ¶¶ 6, 12; *see also* Part II.b.ii *supra*.

Instead, plaintiff cites to *John H. Faunce, Inc. v. United States*, 64 Cust. Ct. 491, 495 (1970), as a case where a device was held to perform analysis. Pl. Br. at 14. In *Faunce*, the device at issue was an optical diffractometer, and the Court relied on the definition of "chemical analysis" from *Burrows* in its analysis and holding that the device performed physical or chemical analysis. 64 Cust. Ct. at 494 (""[In *Burrows*] [w]e stated that "an instrument or apparatus *is included* within the common meaning of the term 'chemical analysis' if it determines one or more ingredients of a substance either as to kind or amount; or if it performs a detailed examination of a complex chemical substance for the purpose of enabling one to understand its nature or to determine an essential feature; or if it determines what elements are present in a chemical substance." 62 Cust. Ct. at 685; 300 F. Supp. at 458."" (emphasis in original)).

As such, plaintiff's citation to *Faunce* further supports the plain meaning of "chemical analysis" articulated in *Burrows*, which clearly encompasses the Smart NOx Sensor Probe's complex, multi-step functions. Specifically, the merchandise determines one or more ingredients

of the exhaust gas either as to *both* kind *and* amount; performs a detailed examination of a complex chemical substance (exhaust gas) for the purpose of enabling one to understand its nature or to determine an essential feature (chemical composition and concentration); and determines what elements are present in a chemical substance ($O_2$ and NOx).  Def. SOF, ¶¶ 6, 12; *see also* Part II.b.ii *supra*.

Plaintiff next argues that, unlike the apparatus in *Faunce*, the Smart NOx Sensor does not determine any other physical or chemical property of anything, and that it simply "senses the presence of NOx and relays the value of the concentration to the ECU where it is obtained in usable format."  Pl. Br., at 15.  Nevertheless, plaintiff's description of the functions of the Smart NOx Sensor meets the common meaning of chemical analysis, because sensing the presence of NOx in the exhaust gas is "determin[ing] what elements are present in a chemical substance," and relaying the value of NOx concentration is "determin[ing] one or more ingredients of a substance either as to kind or amount."  *See Burrows*, 300 F. Supp. at 458; *Pharmacia*, 9 CIT at 441; Def. SOF, ¶¶ 6-7, 10-14.

Next, Plaintiff argues that the Smart NOx Sensor is unlike the thin layer chromatography (TLC) plates at issue in *E.M. Labs, Inc. v. United States*, 80 Cust. Ct. 125, 126-127 (1978), in which the Court considered whether TLC plates should be classified under item 711.88, TSUS, as other instruments or apparatus for chemical analysis.  *See* Pl. Br., at 14-15.  The TLC plates, through application of a developing solvent, break down a substance into its component elements and permit an identification of the separated substances and their component elements. *E.M. Labs*, 80 Cust. Ct. at 126-27.  The Court concluded that the TLC plates were designed for chemical analysis purposes, and should not be classified as pharmaceutical, hygienic, and laboratory glassware, whether or not graduated or calibrated, under item 547.55, TSUS, but

rather under item 711.88, TSUS, as other instruments or apparatus for chemical analysis. *Id.* at 131-132. Plaintiff argues that the Smart NOx Sensor does not break the exhaust gas into its components or allow for identification of each component, and that all the sensor does is "react to the NOx in the exhaust mix." Pl. Br. at 15. Plaintiff's argument is unsupported by the undisputed facts, which show that the sensor performs all of the following: (1) electrochemical separation of $O_2$ and NOx from the exhaust gas; (2) identification and detection of $O_2$ and NOx in the exhaust gas; and (3) quantitative analysis of $O_2$ and NOx by electrochemical pumping of $O^{2-}$ ions, setting up currents proportional to $O_2$ and NOx concentrations. Def. SOF, ¶ 6.

Plaintiff's argument further fails to acknowledge the complex electrochemical processes taking place in the sensor, and that the ability for the sensor to "react to the NOx in the exhaust mix" stems specifically from its ability to separate $O_2$ and NOx from the exhaust gas, specifically detect $O_2$ and NOx in the exhaust gas, and quantify each by electrochemically pumping $O^{2-}$ ions to set up currents proportional to $O_2$ and NOx concentrations which can then be further converted to ppm in the ECU. *See* Pl. Br. at 15; Def. SOF, ¶ 6; Part II.d *supra*, at 48-49. Further, the Probe's functions are similar to the TLC plates' functions because they also involve the breaking down of a substance (the exhaust gas) into component elements ($O_2$ and NOx) through the separation, identification, detection, and quantification of $O_2$ and NOx. Def. SOF, ¶ 6; *E.M. Labs*, 80 Cust. Ct. at 126-27.

Finally, plaintiff argues that the Smart NOx Sensor is unlike the vitascope in *Burrows* because it does not determine any property of the exhaust gas but merely detects and measures the concentration of NOx. Pl. Br., at 15. But in making this argument, plaintiff fails to cite, discuss, or compare the definition of "chemical analysis" used in *Burrows*. *See id.*; 300 F. Supp. at 458. Plaintiff's argument is also unavailing because the Probe does determine at least one

property of the exhaust gas—NOx concentration, by setting up currents proportional to the $O_2$ and NOx concentrations. Def. SOF, ¶¶ 6, 11, 12.

Once again, plaintiff ignores the complex design and electrochemistry undergirding the Smart NOx Sensor Probe's functions, by claiming that the "NOx sensor ignores oxygen to enable detection and measurement of NOx," without explaining how the sensor is supposedly able to simply "ignore" oxygen. Pl. Br., at 15. Moreover, information on the $O_2$ concentration that is generated by the Probe can be used in determining the proper air/fuel ratio and the $O_2$ concentration in the exhaust. Def. SOF, ¶ 19; Def. Ex. 4, Meagher Depo. Tr. at 84:3–84:9 ("Q. Can you read the next bullet? A. The Smart NOx Sensor measures the NOx concentration, air fuel ratio, and oxygen concentration in exhaust gas of combustion engines, gasoline and diesel. Q. Is that an accurate statement? A. Yes."). The Probe's ability to sense oxygen stems specifically from its complex design and function in electrochemically selectively separating $O_2$ and NOx from other gases in the exhaust, detecting each, and quantifying both. Def. SOF, ¶ 6. For these reasons, the Smart NOx Sensor Probe is similar to the other aforementioned devices (including the vitascope and TLC plates), and is thus an instrument or apparatus for chemical analysis.

As reflected by the application of the facts to the law (*i.e.*, the plain meaning of the statute), the imported merchandise is properly classified under subheading 9027.10.20, HTSUS, because it is an instrument or apparatus for chemical analysis, and more specifically, a gas analysis apparatus, according to all of the definitions of chemical analysis discussed above.

III.   **THE SMART NOx SENSOR PROBE IS NOT PROPERLY CLASSIFIED UNDER SUBHEADING 9026.80.20, HTSUS, BECAUSE IT IS NOT USED FOR "MEASURING OR CHECKING THE FLOW, LEVEL, PRESSURE OR OTHER VARIABLES OF LIQUIDS OR GASES"**

Subheading 9026.80.20, HTSUS, provides for "[i]nstruments and apparatus for measuring or checking the flow, level, pressure or other variables of liquids or gases (for example, flow meters, level gauges, manometers, heat meters), excluding instruments and apparatus of heading 9014, 9015, 9028 or 9032; parts and accessories thereof: Other instruments and apparatus: Electrical."  The subheading provides a number of specific examples of the types of variables that are measured, such as the flow, level, or pressure, and corresponding types of devices that measure or check such variables.

### a.  Plaintiff's Interpretation of Heading 9026 Is Not Supported by the Law

Plaintiff glosses over the plain meaning of the terms of heading 9026, and jumps right to guidance of the ENs for heading 9026.  Pl. Br., at 8-9.  The Explanatory Notes for heading 9026 provide, in pertinent part:

> Apart from instruments or apparatus more specifically covered by other headings of the Nomenclature, such as:
>
> (a) Pressure-reducing valves and thermostatically controlled valves (heading 84.81);
>
> (b) Anemometers (wind gauges) and hydrological level gauges (heading 90.15);
>
> (c) Thermometers, pyrometers, barometers, hygrometers and psychrometers (heading 90.25);
>
> (d) Instruments and apparatus for physical or chemical analysis, etc. (heading 90.27),
>
> this heading covers instruments and apparatus for measuring or checking the flow, level, pressure, kinetic energy or other process variables of liquids or gases.

47

From this language, plaintiff focuses on the portion that provides, "this heading covers instruments and apparatus for measuring or checking . . . other process variables of liquids or gasses [*sic*]." Pl. Br., at 8.

Plaintiff defines "process variable" as ""any of those varying operational and physical conditions associated with a chemical processing operation, such as temperature, pressure, flowrate, density, pH, viscosity, or chemical composition." *Id.* at 9. Plaintiff argues that the "essential function" of the imported merchandise "is to measure and check one of the variables of a combustion, power generation, and emissions control process" and that the "process variable is NOx concentration; a combination of NO and NO2 molecules." *Id.* at 11. Plaintiff's argument is confusing. But it appears that plaintiff is arguing that, because the imported merchandise measures NOx content, and NOx content involves the chemical composition of gas, which plaintiff describes as a process variable, then the imported merchandise fits within the parameters of the merchandise described by the Explanatory Notes for heading 9026. Pl. Br., at 11-12 ("Since the definition of 'process variable' includes 'chemical composition,' (2003 McGraw-Hill Dictionary of Scientific and Technical Terms, 6th ed., 2003, p. 1677), NOx content is just one process variable of the exhaust gas in a vehicle.").

Plaintiff's argument is without legal support for several reasons. First, the guidance of the ENs is not binding on the Court. *Kahrs*, 713 F.3d at 645 (citations omitted). Rather, as we explained above, they provide persuasive guidance and "are generally indicative of the proper interpretation," though they do not constitute binding authority. *Kahrs*, 713 F.3d at 645 (citations omitted). And plaintiff fails to provide an analysis of the relevant tariff terms using dictionary definitions or other persuasive authorities.

Second, plaintiff's interpretation of EN 90.26 is contrary to the plain meaning of the terms of that note, as well as to the plain meaning of heading 9027. Explanatory notes, which are not statutory text, cannot expand the scope of their respective headings. The EN begins with the exclusionary phrase, "Apart from instruments or apparatus more specifically covered by other headings of the Nomenclature, such as:" and proceeds to list four headings that should be excluded from inclusion under heading 9026. Next, EN 90.26(d) provides that "[i]nstruments and apparatus for physical or chemical analysis, etc. (heading 90.27)" are expressly excluded from classification under heading 9026. This exclusionary note dovetails with the terms of heading 9027, which covers "instruments and apparatus" for "chemical analysis." Instruments and apparatus for chemical analysis necessarily includes apparatus for measuring the chemical composition of gas. *See supra*, Part II.c (discussing EN 90.27(8) which explains that "Electrical gas or smoke analysis apparatus are mainly for *determining and measuring the content of the following gases*: carbon dioxide, carbon monoxide and hydrogen, oxygen, hydrogen, sulphur dioxide, ammonia." (emphasis added)). Therefore, interpreting the phrase "measuring or checking . . . other process variables of liquids or gases" (from EN 90.26) as including the measuring of the chemical composition of gas would render the exclusionary clause of EN 90.26, and the plain language of heading 9027, a nullity.

Pursuant to the doctrine of *expressio unius est exclusio alterius*, statutory text must be read to avoid internal inconsistencies. "[I]n general, 'a matter not covered is to be treated as not covered.'" *GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1645 (2020) (quoting Antonin Scalia & Brian Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012)); *see also Int'l Trading Co. v. United States*, 306 F. Supp. 2d 1265, 1269 n8 (Ct. Int'l Trade 2004) ("A canon of statutory construction is that a

statute should be read to avoid internal inconsistencies."). In short, instruments or apparatus for chemical analysis, which include instruments or apparatus for determining or measuring the chemical composition of gas, such as the Smart NOx Sensor Probe, are properly classified under heading 9027 by application of the plain meaning of heading 9027 and the exclusionary phrase of EN 90.26(d).

Third, the phrase "instruments and apparatus for measuring or checking the flow, level, pressure or other variables of liquids or gases" (heading 9026) does not include the determination of "chemical composition." To begin, we define several of these heading terms. The most relevant definition of the verb "measure" for this case is "to ascertain the measurements of." Pl. Br., at 10. The most relevant definition of the verb "check" is "to inspect, examine, or look at appraisingly or appreciatively —usually used with *out* or *over*," definition 1.a., because this definition appears to be most similar to measure, as signaled by the conjunctive "or." Def. Ex. 5 at 2, *available at* https://www.merriam-webster.com/dictionary/check (last viewed Dec. 7, 2021). The most relevant definition of the noun "flow" is "the quantity that flows in a certain time," definition 4, because the example phrase "a gauge that measures fuel flow" incorporates the term "measure" which appears in the tariff heading. *Id.* at 4, *available at* https://www.merriam-webster.com/dictionary/flow (last viewed Dec. 7, 2021). The most relevant definition of the noun "level" is "horizontal condition, *especially*: equilibrium of a fluid marked by a horizontal surface of even altitude" given the inclusion of the term "fluid," which specifically describes "liquids and gases," which appears in the tariff term. *Id.* at 7, 10, *available at* https://www.merriam-webster.com/dictionary/level (last viewed Dec. 7, 2021) and https://www.merriam-webster.com/dictionary/fluid (last viewed Dec. 7, 2021) ("a substance (such as a liquid or gas) tending to flow or conform to the outline of its container"). The most relevant definitions of

the noun "pressure" are "the application of force to something by something else," "the action of a force against an opposing force," and "the force or thrust exerted over a surface divided by its area." *Id.* at 15, *available at* https://www.merriam-webster.com/dictionary/pressure (last viewed Dec. 7, 2021).

Taken together, the plain meaning of "[i]nstruments and apparatus for measuring or checking the flow, level, pressure or other variables of liquids or gases" is instruments and apparatus for ascertaining the measurements of or inspecting 1) the quantity that flows in a certain time, 2) the equilibrium, 3) the force or thrust exerted over a surface divided by its area, or 4) other variables of liquids or gases. The Smart NOx Sensor Probe's complex function is not described by the plain meaning of the terms in heading 9026. The Probe is not "ascertaining the measurement of" or "inspecting" "the quantity that flows in a certain time" of any liquid or gas, because the Probe does not provide a measurement of a quantity over a period of time (*e.g.* volume per time unit). *See* Def. Ex. 3, Tab A, at 5 ("[O]ne determines a single gas flowrate in volume/time units in a single physical measurement."). It also does not function like "a gauge that measures fuel flow," but rather, it determines the chemical concentration of NOx in the exhaust gas, and facilitates its provision in ppm. Def. SOF, ¶¶ 6, 11, 14. The Probe is also not "ascertaining the measurement of" or "inspecting" "the equilibrium of a fluid marked by a horizontal surface of even altitude;" indeed, no evidence in the record matches this description. *See* Pl. SOF and Def. SOF. The Probe is also not "ascertaining the measurement of" or "inspecting" "the force or thrust exerted over a surface divided by its area." *See id.* In fact, additional information, such as gas pressure, is needed to further process the milliampere data (the raw data) generated by the Smart NOx Sensor's Probe, and thus to mathematically convert this raw data into units of concentration for $O_2$ and NOx in ppm. Def. SOF, ¶¶ 11, 14. The last

remaining question, then, is whether the Smart NOx Sensor Probe "ascertains the measurement of" or "inspects" "other variables of liquids or gases."

The phrase "other variables of liquids or gases" is not defined in heading 9026. However, as plaintiff notes, the phrase is described by the explanatory notes. EN 90.26 begins with the exclusionary phrase, "Apart from instruments or apparatus more specifically covered by other headings of the Nomenclature, such as:" and proceeds to list four headings that should be excluded from inclusion under heading 9026. One of these headings appears in EN 90.26(d): "Instruments and apparatus for physical or chemical analysis, etc. (heading 90.27)." After listing the four excluded headings, EN 90.26 ends with "this heading covers instruments and apparatus for measuring or checking the flow, level, pressure, kinetic energy or other process variables of liquids or gases." The phrase "other process variables of liquids or gases," however, is not defined in the EN.

Plaintiff provides a definition of "process variable" as "any of those varying operational and physical conditions associated with a chemical processing operation, such as temperature, pressure, flowrate, density, pH, viscosity, or chemical composition." Pl. Br., at 9. However, other authorities do not include chemical composition in the definition of a process variable. For example, McGraw-Hill Education's *Chemical Engineering: The Essential Reference*, does not reference chemical composition in its list of process variables: temperature, pressure, moles and molecular weights, mass and volume, viscosity, surface tension, heat capacity and thermal conductivity, diffusion coefficients, pH, Reynolds number, the ideal gas law, and property estimation. Def. Ex. 5, at 16-17.

Nevertheless, any ambiguity among reference sources is resolved by returning to heading 9026 and its EN. Heading 9026 does not list "chemical composition" among the other variables

listed ("flow, level, pressure"). EN 90.26 also does not list "chemical composition" among the other variables listed ("flow, level, pressure, kinetic energy"). Further, and most importantly, EN 90.26(d) specifically excludes "[i]nstruments and apparatus for physical or chemical analysis, etc. (heading 90.27)." As discussed in Part II.c *supra*, EN 90.27(8) explains that heading 9027's "instruments and apparatus for physical or chemical analysis" includes instruments and apparatus "for determining and measuring the content" of gases; that is, it includes instruments and apparatus that determine and measure the chemical content or composition of gases. In sum, (1) "chemical composition" is not a process variable specifically listed or included in heading 9026 or EN 90.26, (2) "chemical composition" is specifically encompassed in EN 90.27(8) by the phrase "for determining and measuring the content", and (3) EN 90.26(d) specifically excludes instruments and apparatus for chemical analysis of heading 9027. Therefore, the plain language of these authorities shows that heading 9026 does not include instruments or apparatus that measure or determine "chemical composition," for if "other variables" in heading 9026 included chemical composition, then both headings 9026 and 9027 would lose the very distinction that separates them.

The flawed nature of plaintiff's argument that heading 9026 includes "chemical composition" as a type of "process variable," under the heading's phrase "other variables of liquids and gases," is illustrated by another example. Plaintiff provides a definition of "process variable" that includes "viscosity." Pl. Br., at 9. However, heading 9027 specifically includes "instruments and apparatus for measuring or checking viscosity, porosity, expansion, surface tension or the like." As such, the phrase "other variables" from heading 9026, as well as the phrase "other process variables" from EN 90.26, cannot mean *any* other variable or process variable, as plaintiff's argument implies, because devices that measure "viscosity, porosity,

expansion, surface tension or the like" must be classified under heading 9027.  Consequently, heading 9026 only includes instruments and apparatus that measure or check certain types of variables (flow, level, pressure, kinetic energy) which are *not excluded* by the variables described in heading 9027, such as viscosity, porosity, expansion, surface tension, or in EN 90.27 (chemical composition, such as content of gases).  Relatedly, heading 9026 also excludes "instruments and apparatus for measuring or checking quantities of heat, sound or light" because they are specifically included in heading 9027.

In short summary, the above analysis shows that heading 9026 includes only *some* instruments for measuring or checking *certain* variables, and further excludes "instruments and apparatus of heading 9014, 9015, 9028 or 9032," whereas heading 9027 includes not only instruments for physical or chemical analysis, but also instruments and apparatus "for measuring or checking viscosity, porosity, expansion, surface tension or the like[,]" and "quantities of heat, sound or light[,]" as well as microtomes and parts and accessories of all the foregoing.

### b.  The Smart NOx Sensor Probe Is Dissimilar to the Exemplars of Heading 9026

The exemplars listed in heading 9026, "(for example, flow meters, level gauges, manometers, heat meters)," are significantly unlike the Smart NOx Sensor Probe.  A flow meter (also spelled "flowmeter") is "an instrument for measuring one or more properties (such as velocity or pressure) of a flow (as of a liquid in a pipe)."  Def. Ex. 5, at 6, *available at* https://www. merriam-webster.com/dictionary/flowmeter (last viewed Dec. 8, 2021).  A flow meter is "based on primarily a one-step, physical measurement."  Def. Ex. 3, Tab A, at 2.  In his expert witness report, Dr. Bartholomew explains how a bubble flow meter operates to conduct a simple physical measurement of gas velocity.  *Id.* at 4.  He explains how he and his students have

used a burette calibrated with volume marks, with a side arm and bulb to calibrate more expensive flow meters. *Id.* at 5 (see figure below).



**Simple bubble flow meter**

"The principle is very simple: fill the bulb with soap solution, hook up the side arm to the exit of the flow meter to be calibrated, squeeze the bulb to form a bubble, and use a stopwatch to measure how fast the bubble climbs from zero to the maximum volume." *Id.* In this way, "one determines a single gas flowrate in volume/time units in a single physical measurement." *Id.* "The bubble flow meter is not so much different in principle than more expensive, calibrated volumetric flow meters." *Id.*

A definition of "level gauge" could not be found as such in a number of dictionaries consulted, but one of the top results in a Google search reveals one definition (and photograph) by Archon Industries, Inc., an industrial company located in New York which manufactures liquid level gauges:

> Level gauges are measuring instruments that are used to detect the level of a process fluid or gas in a tank, vessel, or storage container. Level gauges are widely used in industrial process applications and are put into service to measure the fluid levels in drums, tanks, pressure vessels, or other similar applications. Process conditions such as operating temperature, pressure, process media, and center-center lengths will determine the suitable type of level gauge required.



**Magnetic liquid level gauge**

Def. Ex. 5, at 11, *available at* https://archonind.com/products/level-gauge/ (last viewed Dec. 8,

2021).  A manometer is "an instrument (such as a pressure gauge) for measuring the pressure

of gases and vapors."  Def. Ex. 5, at 12, *available at* https://www.merriam-webster.com/

dictionary/manometer (last viewed Dec. 8, 2021).  A heat meter is:

> A device that measures the amount of thermal energy flowing
> through a system. It operates by measuring the flow rate of the
> fluid through the system and the temperature difference between
> the output and return of the system. The flow can be measured
> using a turbine or ultrasonically. The temperature difference is
> usually measured using two thermocouples.

Def. Ex. 5, at 8, *available at* https://www.oxfordreference.com/search?q=Heat+meter&

searchBtn=Search&isQuickSearch=true&print (last viewed Dec. 7, 2021).

One commonality among all of the above instruments is their relative simplicity in design

and function, particularly in comparison to the highly complex Smart NOx Sensor Probe with its

harness and probe containing three electrochemical cells.  Another commonality is their direct

measurement of a variable (such as flow, level, or pressure) in a "single physical measurement,"

primarily conducted in one step.  *See* Def. Ex. 3, Tab A, at 2, 5.  These commonalities shed light

on the legal meaning of "instruments and apparatus for measuring or checking the flow, level,

pressure or other variables of liquids or gasses," which necessarily exclude complex devices that

provide determinations of chemical composition through multi-step processes.

The Smart NOx Sensor Probe is unlike any of the devices listed in heading 9026, as it does not share the primary commonalities among those devices. It "is not like a flow meter, which simply physically measures flow rate," and does not measure one or more properties (such as velocity or pressure) of a flow of any liquid or gas. *See* Def. Ex. 3, Tab A, at 5; *see also* Def. SOF, ¶ 6. Unlike the flow meter, which has a very basic design as is readily apparent, *see supra* at 74, and which functions primarily in one step, the Probe determines the concentration of $O_2$ and NO in exhaust gas entering and exiting the SCR system through a multi-step process that includes (1) electrochemical separation of $O_2$ and NOx from the exhaust gas; (2) identification and detection of $O_2$ and NOx in the exhaust gas; and (3) quantitative analysis of $O_2$ and NOx by electrochemical pumping of $O^{2-}$ ions, setting up currents proportional to $O_2$ and NOx concentrations. Def. SOF, ¶ 6.

The Smart NOx Sensor Probe is also not like a level gauge, as it does not detect the level of a process fluid or gas in a tank, vessel, or storage container; instead, it determines the chemical concentration of $O_2$ and NO in exhaust gas entering and exiting the SCR system. Def. SOF, ¶ 6. The Probe is also not like a manometer, as it does not measure the pressure of any gases. *See id.* Finally, the Probe is not like a heat meter, as it does not measure the amount of thermal energy flowing through a system, given that it does not measure the flow rate of the fluid through the system and the temperature difference between the output and return of the system. *See id.*

As we have demonstrated, not only does the plain meaning of the terms in heading 9026 not describe the Smart NOx Sensor Probe because it does not "measure or check the flow, level, pressure or other variables of liquids or gases," but EN 90.26(d) specifically excludes instruments and apparatus for chemical analysis, such as the sensor which determines the

chemical concentration of NOx in the exhaust gas. Plaintiff's arguments to the contrary are unavailing.

## IV.    THE ANALYSIS OF RULING H262310 IS CONSISTENT WITH THE ESTABLISHED FRAMEWORK FOR TARIFF CLASSIFICATION AND CLASSIFYING MERCHANDISE PURSUANT TO THE PLAIN MEANING OF THE TARIFF STATUTE

Although this Court conducts a *de novo* review in each classification case, "Customs' ruling letters, as explanations of classification decisions, are entitled to a level of 'respect proportional to their power to persuade.'" *Plexus Corp. v. United States*, 489 F. Supp. 3d 1379, 1402 (Ct. Int'l Trade 2020) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)). The degree of a ruling letter's persuasive power may be found in "the agency's thoroughness, logic and expertness, and consistency with prior interpretations." *Plexus*, 489 F. Supp. 3d at 1403 (citing *Mead*, 533 U.S. at 235).

In Ruling H262310, Customs considered whether plaintiff's NOx Sensors are properly classified under heading 9027, HTSUS, as "instruments and apparatus for physical or chemical analysis," or under heading 9026, as "instruments and apparatus for measuring or checking the flow, level, pressure or other variable of liquids or gases." Pl. Addendum, Tab 5 (H262310) at 2-3. The ruling first provides a factual description of the merchandise, its components, and its functions, summarizing that when the sensor element of the probe comes into contact with nitric oxide, an electrochemical reaction occurs which generates a voltage in proportion to the concentration of nitric oxide present. *Id.* at 1-2. The ruling next sets forth the appropriate legal framework for classification of goods under the HTSUS, and considers both tariff headings at issue as well as their respective ENs. *Id.* at 2-3. The ruling then addresses and responds to Continental's arguments that the Smart NOx Sensor is a measuring device, and considers relevant case law by discussing the *Pharmacia* and *Burrows* cases, including their definitions of

58

"chemical analysis." *Id*. at 3-4. The ruling then explains that the process by which the probe detects the concentration of nitric oxide constitutes analysis because it involves detecting NOx in the exhaust gas and quantifying its concentration. *Id*. at 4-5. The ruling also explains that the NOx Sensor is not classifiable under heading 9026 "because the sensors are not for measuring or checking the flow, level, pressure or other variables of liquid or gases as explained in EN 90.26." *Id*. at 5. Finally, the ruling considers that Customs has previously classified gas detectors similar to the NOx Sensor under heading 9027, HTSUS, in other rulings. *Id*.

The analysis in H262310 is consistent with the established framework for tariff classification and classifying merchandise pursuant to the plain meaning of the tariff statute for several reasons. First, the ruling appropriately considered the plain meaning of "chemical analysis" in 9027 by discussing the definition articulated in *Burrows*, which employed dictionary definitions of "chemical analysis". *Id*. at 4. Second, the ruling's description of the NOx Sensor's function meets the definitions of determining "one or more ingredients of a substance either as to kind or amount" and determining "what elements are present in a chemical substance," from *Burrows*, because the sensor's probe identifies and detects NOx through an electrochemical reaction that generates a voltage in proportion to the concentration of NOx present in the exhaust gas. *Id*. at 2, 4-5.

Next, the ruling also appropriately considers the dictionary definition of "measure" previously relied upon by the Court of Customs and Patent Appeals (citing to Webster's dictionary), which describes "measure" as "to ascertain the quantity, mass, extent, or degree of in terms of a standard unit or fixed amount . . .," and concludes that, based on its function, the NOx Sensor does not "measure" pursuant to this definition. Pl. Addendum, Tab 5, at at 5. Further, the ruling properly notes that EN 90.26 covers products not "covered by other headings in the

Nomenclature, such as . . . [i]nstruments and apparatus for physical and chemical analysis." *Id.* As such, the ruling appropriately acknowledges that even if the NOx Sensor could be described as performing both "measuring" and "chemical analysis," the fact that it does perform the latter pursuant to heading 9027 necessarily militates its exclusion from heading 9026, pursuant to EN 90.26. Finally, the ruling's consideration of similar devices' classifications in other rulings further reflects its aim for consistency with the framework for tariff classification. *Id.*

Although it is unnecessary to consider deference to the ruling as the merchandise is appropriately classified under subheading 9027.10.20 pursuant to the plain meaning of the tariff terms and the framework of the GRIs, as we have demonstrated above, the analysis of Ruling H262310 is sound because it is consistent with the established legal framework for tariff classification and classifying the merchandise pursuant to the plain meaning of the tariff statute. Plaintiff's arguments to the contrary are without merit.

Plaintiff briefly cites several administrative rulings that it believes support its position that the Smart NOx Sensor should be classified under heading 9026. However, all of these rulings are inapposite. Ruling N270334 (Pl. Br. at 7, 16-17; Pl. Addendum, Tab 6) involved a hydrogen sensor used within a hydrogen storage tank in which the sensor only detected the presence of hydrogen and performed no measuring or analysis. In Ruling HQ 967082, CBP classified two gas detectors which provide audible and visual warnings but do not provide measurements under heading 8531 as "electrical sound or visual signaling apparatus," while a third gas detector with alarms and displays of measured gas levels was classified under heading 9027 because its electrochemical cells conducted gas analysis (similar to the Smart NOx Sensor Probe). Pl. Addendum, Tab 6. In Ruling NY D89283, CBP classified an air flow sensor measuring the mass of air entering the engine and emitting an analog electric signal that would

show a readout if connected to a simple output device in heading 9026 because that heading explicitly includes flow meters such as this device, and the device did not analyze the air passing through. *Id.*, Tab 7. In Ruling NY 851139, CBP classified gas monitors able to monitor multiple gases and provide digital readouts and sounds alarms in heading 9027 because they employed electrochemical sensors and analyzed gas. *Id.*, Tab 8. In Ruling HQ 086057, CBP classified monitors that detect carbon monoxide levels in breath and display a ppm signal under heading 9018 as "electro-diagnostic apparatus" because they were used in medical, surgical, dental or veterinary sciences. *Id.*, Tab 9, at 1, 5. Finally, in Rulings HQ 086465 and N239797, CBP classified oxygen sensors (or their parts) in heading 9027 because they quantified the amount of oxygen in ppm (similar to the Smart NOx Sensor Probe). *Id.*, Tabs 11 and 12. As such, all of the rulings relied upon by plaintiff are inapposite, and none support plaintiff's argument that the Smart NOx Sensor or its Probe should be classified under heading 9026.

## CONCLUSION

As we have demonstrated above, the Smart NOx Sensors, as well as their Probes, are properly classifiable as instruments or apparatus for chemical analysis under heading 9027, HTSUS, and more specifically as gas analysis apparatus under subheading 9027.10.20, HTSUS, and not as measuring or checking instruments or apparatus under subheading 9026.80.20, HTSUS. For all the foregoing reasons, we respectfully request that the Court deny plaintiff's motion for summary judgment, grant our cross-motion for summary judgment, enter judgment for the United States, and dismiss the action.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel*:                    /s/ Brandon A. Kennedy
Edward Maurer                 BRANDON A. KENNEDY
Deputy Assistant Chief Counsel     Trial Attorney
Michael Anderson            Civil Division, U.S. Dept. of Justice
General Attorney             Commercial Litigation Branch
Office of the Assistant Chief Counsel  26 Federal Plaza, Room 346
International Trade Litigation     New York, New York 10278
U.S. Customs and Border Protection   Tel.: (212) 264-9230
New York, New York 10278      *Attorneys for Defendant*

Dated: December 22, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, *SENIOR JUDGE*
_____

| | | |
|---|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 18-00026 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Brandon A. Kennedy, a Trial Attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is the attorney responsible for Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment, relying upon the word count feature of the word processing program used to prepare the response, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 15,341 words.

/s/ Brandon A. Kennedy
BRANDON A. KENNEDY