UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. JANE A. RESTANI, *JUDGE*

---

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

Court No. 18-00026

---

### DEFENDANT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel*:                                     BRANDON A. KENNEDY
Edward Maurer                                 Trial Attorney
Acting Assistant Chief Counsel       Civil Division, U.S. Dept. of Justice
Michael Anderson                            Commercial Litigation Branch
General Attorney                              26 Federal Plaza, Room 346
Office of the Assistant Chief Counsel   New York, New York 10278
International Trade Litigation           Tel.: (212) 264-9230
U.S. Customs and Border Protection   *Attorneys for Defendant*
New York, New York 10278

Dated: March 8, 2022

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

   I.  THE SMART NOx SENSOR'S PROBE PERFORMS CHEMICAL ANALYSIS, AS
      THAT TERM IS DEFINED BY DICTIONARIES, THE CASE LAW, AND THE
      FIELD OF ANALYTICAL CHEMISTRY ...................................................................... 2

   II.  THE SMART NOx SENSOR'S PROBE IS AN ELECTRICAL "GAS OR
      SMOKE ANALYSIS APPARATUS" IDENTIFIED *EO NOMINE* IN SUBHEADING
      9027.10.20.................................................................................................................. 12

   III. THE SMART NOx SENSOR'S PROBE CANNOT FALL UNDER HEADING 9026,
      PURSUANT TO THE TERMS OF BOTH HEADINGS 9026 AND 9027, AS WELL
      AS TO EXPLANATORY NOTES 90.26 AND 90.27(8) ............................................... 17

   IV. DEFENDANT HAS NOT WAIVED ARGUMENTS .................................................... 21

CONCLUSION................................................................................................................ 22

# TABLE OF AUTHORITIES

## Cases

*Aromont USA, Inc. v. United States*
   671 F.3d 1310, 1312 (Fed. Cir. 2012)...............................................................................13,14

*Burrows Equipment Co. v. United States*,
   300 F. Supp. 455 (1969) .................................................................................*passim*

*Pharmacia Fine Chemicals, Inc. v. United States*,
   9 CIT 438 (1985) ...............................................................................................3, 6, 11

*Plexus Corp. v. United States*,
   489 F. Supp. 3d 1379, 1402 (Ct. Int'l Trade 2020)................................................21

*R.T. Foods, Inc. v. United States*,
   757 F.3d 1349 (Fed. Cir. 2014).............................................................................15

*Schlumberger Tech. Corp. v. United States*,
   845 F.3d 1158 (Fed. Cir. 2017).............................................................................13

*United States v. Carborundum Co.*,
   63 C.C.P.A. 98, 102, 536 F.2d 373, 377 (1976)....................................................14

*United States v. Mead Corp.*,
   533 U.S. 218, 235 (2001) .......................................................................................21


## Harmonized Tariff Schedule of the United States

General Rule of Interpretation 1 .................................................................................16

Chapter 21

   Heading 2104 ........................................................................................................13

Chapter 69

   Heading 6909 ........................................................................................................13

Chapter 85

   Heading 8543 ........................................................................................................20

Chapter 90

> Heading 9026 .................................................................................................*passim*

>> Subheading 9026.80.20 ............................................................................... 22

>> Explanatory Note 90.26 ............................................................ 2, 17, 18, 19, 21

>> Explanatory Note 90.26(d) ...................................................................... 2, 17

> Heading 9027 .................................................................................................*passim*

>> Subheading 9027.10.20 ..................................................................... 1, 12, 13, 22

>> Explanatory Note 90.27(8) ......................................................................*passim*

>> Explanatory Note 90.27(8)(viii) ............................................................. 16, 19


**Statutes**

28 U.S.C. § 2640(a)(1) .......................................................................................... 21


**Other Authorities**

HQ H262310 (July 11, 2016) ................................................................................. 21

NY N270334 (Nov. 23, 2015) ................................................................................ 20

*Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature
Structure of the Harmonized System: Submitting Report*
   USITC Pub. No. 1400 at 34-35 (June 1983) ......................................................... 3

*Chemical Analysis*, Encyclopedia Britannica,
   https://www.britannica.com/science/chemical-analysis
   (last viewed Dec. 3, 2021) ................................................................................*passim*

*In Particular*, Google Oxford Languages,
   https://www.google.com/search?q=in+particular +definition
   (last viewed March 7, 2022) ................................................................................ 15

*Measure*, Google Oxford Languages,
   https://www.google.com/search?q=measure+definition
   (last viewed Feb. 1, 2022) .............................................................................. 5, 7, 8

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. JANE A. RESTANI, *JUDGE*

————————————————————————————

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., | : |
| | : |
| Plaintiff, | : |
| | :   Court No. 18-00026 |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

————————————————————————————

## DEFENDANT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant, the United States (the Government), respectfully submits this memorandum in reply to plaintiff's, Continental Automotive Systems, Inc. (Continental), response to our cross-motion for summary judgment.  As further shown below, summary judgment in favor of defendant is appropriate because there are no genuine issues of material fact and the undisputed facts show that defendant is entitled to judgment in its favor as a matter of law.

## INTRODUCTION

In our cross-motion, we established that the proper classification of the Smart NOx Sensor's Probe is as a chemical analysis apparatus under heading 9027, of the Harmonized Tariff Schedule of the United States (HTSUS), and more specifically as an electrical gas analysis apparatus under subheading 9027.10.20.  Chemical analysis is defined as the determination of the physical properties or chemical composition of samples of matter.  In this case, the Probe determines the NOx concentration in exhaust gas through various steps and chemical reactions, the combination of which constitute chemical analysis as defined by the dictionary, the case law, the Explanatory Notes (ENs), and the field of analytical chemistry.

The Probe cannot be classified under heading 9026, pursuant to the terms of headings 9026 and 9027, as well as ENs 90.26 and 90.27(8), as it is an apparatus for chemical analysis. EN 90.26(d) excludes apparatus for chemical analysis from classification under heading 9026, and this exclusionary note dovetails with the terms of heading 9027, which covers apparatus for chemical analysis.  Further, EN 90.27(8) explains that "gas or smoke analysis apparatus" are mainly for "determining and measuring the content" of gases.  Thus, apparatus for chemical analysis necessarily includes apparatus for measuring the chemical content, composition, or concentration of gases.  Hence, interpreting the phrase "measuring or checking . . . other process variables of liquids or gases" (from EN 90.26) as including the measuring of the chemical composition or concentration of gas, as Continental incorrectly suggests, would render the exclusionary clause of EN 90.26(d), and the plain language of the terms of heading 9027, a nullity.

Accordingly, for the reasons provided below and those in our cross-motion, the Government's cross-motion for summary judgment should be granted, and Continental's summary judgment motion should be denied.

## **ARGUMENT**

### I.   **THE SMART NOx SENSOR'S PROBE PERFORMS CHEMICAL ANALYSIS, AS THAT TERM IS DEFINED BY DICTIONARIES, THE CASE LAW, AND THE FIELD OF ANALYTICAL CHEMISTRY**

Encyclopedia Britannica defines "chemical analysis" as the "determination of the physical properties or chemical composition of samples of matter."  Def. Cross-Mot., Ex. 5 at 3, available at https://www.britannica.com/science/chemical-analysis (last viewed Dec. 3, 2021). In *Burrows Equipment Co. v. United States,* 300 F. Supp. 455, 458 (1969), the Customs Court held that an instrument or apparatus is included within the common meaning of the term

2

"chemical analysis" "if it determines one or more ingredients of a substance either as to kind or amount; or if it performs a detailed examination of a complex chemical substance for the purpose of enabling one to understand its nature or to determine an essential feature; or if it determines what elements are present in a chemical substance."  In *Pharmacia Fine Chemicals, Inc. v. United States*, 9 CIT 438, 441 (Ct. Int'l Trade 1985), the Court of International Trade held that "instruments or apparatus for physical or chemical analysis" of item 711.88 of the Tariff Schedule of the United States (TSUS) describes articles that are "chiefly used to perform or facilitate physical or chemical determination of the quantity, qualities, or composition of a substance."[1]  As reflected in these legal authorities, the common meaning of "chemical analysis" is determining the physical properties or chemical composition of something.  It is the act of performing or facilitating the physical or chemical determination of the quantity, qualities, or composition of a substance.

The description of the merchandise from Continental's reply brief papers shows that the Smart NOx Sensor's Probe bears the design features and functions that meet all the elements of the common meaning of chemical analysis.  *See* Pl. Resp. to Def. Statement of Material Facts (SOF), at 5-8.  There is no dispute that the Smart NOx Sensor can detect NO, $NO_2$, and $NH_3$. *Id.*, ¶ 18.  Further, there is no dispute that the electrochemical cells in the Smart NOx Sensor's Probe can <u>detect</u> NO, $NO_2$, and $NH_3$ (*id.*, ¶ 18), and that the processes that take place in the Probe's cavities involve (1) the <u>separation</u> and removal of $O_2$ from the exhaust gas (*id.*, ¶ 12), (2) the diffusion of the exhaust gas into the second cavity, which contains an electrochemical cell

---

[1] As we explained in our opening papers, the legal framework of "chief use" was discontinued when the TSUS was discontinued.  *Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System: Submitting Report* at 34-35 (USITC Pub. No. 1400) (June 1983).

with an electrode that is designed to <u>selectively</u> dissociate NOx to nitrogen and $O^{2-}$ ions and electrochemically pump the $O^{2-}$ ions from the cavity (*id.*), (3) the <u>separation</u> and removal of NOx from the exhaust gas mixture within the Probe (*id.*), and (4) the <u>generating of an electric current signal (raw data)</u> that is proportional to the concentration of NOx present in the exhaust gas (*id.*). Pl. Resp. to Def. SOF, at 6-7, 9. Continental has also acknowledged that the Smart NOx Sensor's Sensor Control Unit (SCU)[2] contains hardware, electrical circuits, and software (*id.*, ¶ 14), and that the SCU translates and enhances the electrical signals from the Probe into (5) <u>milliampere data</u>, which the Engine Control Unit (ECU) then further converts into units of concentration for $O_2$ and NOx in ppm (*id.*). Pl. Resp. to Def. SOF, at 7-8. Consequently, Continental's description of the merchandise shows that the Smart NOx Sensor's Probe performs all of the characteristics of chemical analysis, which is defined in part as determining the chemical composition of something, separating chemical species, selectively identifying or detecting chemical species, or quantifying chemical species.

It is important to note that only the Probe—and not the whole Smart NOx Sensor, which includes the Sensor Control Unit (SCU)—is the subject of this litigation. Pl. Resp. to Def. SOF, ¶ 1. Although this point is undisputed, *id.*, Continental argues that "heading 9027 seems to suggest that if an entire device is classified within its scope, any parts of that device also fall into the same heading by default." *See* Pl. Reply Br., at 2, fn 2 (citations omitted). "[I]t is Continental's position that entire [*sic*] NOx sensor, not just the probe, is a measuring device under heading 9026, not an analytical device under heading 9027." *Id*. This analysis is incorrect. As we demonstrated in our opening papers, the Probe is itself an instrument or

---

[2] Continental sometimes refers to the SCU as a Signal Conditioning Unit. *See* Pl. Reply Br., at 5.

apparatus for chemical analysis, and is clearly described by an *eo nomine* exemplar of heading 9027 as a gas analysis apparatus.  Although adding the SCU to the Probe enhances the usefulness of the Probe by helping convert the raw data to a signal that the ECU can "read" and further refine, the SCU does not change the basic function of the Probe, nor is the SCU necessary before the Probe can perform chemical analysis.

Continental criticizes the "painstaking detail" in which we describe the functions of the Probe.  Pl. Reply Br. at 3.  But a clear understanding of the operations and functions of the Probe is necessary to determine the correct classification.  Continental describes the function of the Probe as the "measurement of the NOx concentration by creating a proportional electric signal." *Id*.  But this description simply uses the language of heading 9026 ("measure") without engaging in the necessary factual analysis and describing how the Probe operates.  Further, while defendant depicted and described the merchandise using a graphic from Continental's *own* internal business records, *see* Def. Cross-Mot., Figure 2 at 16 (showing the complex processes that take place in the Smart NOx Sensor's Probe), Continental de-emphasizes the complexity of the merchandise by using a simpler graphic created by Continental's expert and former employee for the purposes of litigation.  *Compare* Pl. Reply Br., at 6, *with* Def. Cross-Mot., at 16; *see also* Def. Cross-Mot., at 35.

Continental argues that the Smart NOx Sensor does not meet the dictionary definition of "chemical analysis" because it only "measures the concentration of NOx" and cannot "determine the physical properties or chemical composition of samples of matter."  Pl. Reply Br. at 7.  Yet as reflected by Continental's own description of the merchandise, the Probe is designed to detect and quantify NOx in exhaust gases.  Pl. Resp. to Def. SOF, ¶¶ 12, 14.  Therefore, it is used to determine the chemical composition of samples of matter.

Continental next argues that the sensor cannot determine NO from NO$_2$, or tell "with exactitude" whether a specific component of the exhaust gas is water vapor, hydrocarbon, or something else.  Pl. Reply Br., at 7.  But again, the undisputed facts show otherwise.  As noted above, the sensor provides raw data in milliamperes to quantify the concentration of NOx in the exhaust gas.  *See* Pl. Resp. to Def. SOF, ¶¶ 12, 14.  As explained previously, the common meaning of "chemical analysis" is determining the physical properties or chemical composition of something, and the Probe performs the function of chemical analysis because it provides the concentration (or composition) of chemical constituents (*i.e.*, NOx) in the exhaust gas.

Furthermore, it is undisputed that the sensor "detect[s] the combined property of the nitrogen substances."  Pl. Reply Br., at 7.  This description alone is sufficient to meet the common meaning of chemical analysis, which involves determining the physical properties or chemical composition of matter.  Moreover, detecting the combined property of the nitrogen substances necessarily informs us about the chemical composition of the nitrogen substances in the exhaust gas.  Continental argues that the sensor "cannot discriminate among those substances or provide a separate measurement of each."  *Id.*  But the common meaning of chemical analysis does not require this level of "exactitude" as implied by Continental in its reply brief.  *See id.*

Continental also misapplies the definitions set forth in *Burrows* and *Pharmacia*.  Recall that Continental is of the view that "[c]lassification in heading 9027 is limited to devices that perform analysis."  Pl. Mot. for Summary J. at 15.  Continental claims that "the NOx sensor performs no such analysis but merely measures the concentration of NOx, making it classifiable in heading 9026."  *Id*.

With this context in mind, we turn to Continental's arguments involving the *Burrows* decision.  Continental argues that under *Burrows*, 300 F. Supp. at 458, "the definition of

'chemical analysis' requires: (1) determination of one or more ingredients of a substance either as to kind or amount; (2) performing a detailed examination of a complex substance for the purposes of understanding its nature of [*sic*] features; or (3) determination of what elements are present in a substance."  Pl. Reply Br., at 7.  Continental says that "it is difficult to imagine how determining an ingredient of a substance as to 'amount' is any different from 'measurement' and that the *Burrows* court intended to conflate the terms 'analysis' and 'measurement.'"  *Id*.  In Continental's view, "[c]oncluding that the determination of the amount of an ingredient—*i.e.*, 'measurement'—somehow constitutes 'analysis' would obliterate HTSUS heading 9026 because any measurement would necessarily become analysis."  *Id*.

Not so.  A closer reading of the definitions yields their distinctions.  The term "measure" is defined as: "1. ascertain the size, amount, or degree of (something) by using an instrument or device marked in standard units or by comparing it with an object of known size."  Google Oxford Languages, *available at* https://www.google.com/search?q=measure+definition (last viewed Feb. 1, 2022).  This definition suggests that the act of measuring is performed *directly* on "something" using an instrument or device that is "marked in standard units or by comparing it with an object of known size."

This definition of measure stands in sharp contrast to the description of chemical analysis reflected in *Burrows.*  The *Burrows* court held that an instrument or apparatus is included within the common meaning of the term "chemical analysis" "if it determines one or more ingredients of a substance either as to kind or amount; or if it performs a detailed examination of a complex chemical substance for the purpose of enabling one to understand its nature or to determine an essential feature; or if it determines what elements are present in a chemical substance."  300 F. Supp. at 458.

This definition dovetails with EN 90.27(8) which describes "gas or smoke analysis apparatus" as follows:

> These are used to analyze combustible gases or combustion by-products (burnt gases) in coke ovens, gas producers, blast furnaces, etc., in particular, for determining their content of carbon dioxide, carbon monoxide, oxygen, hydrogen, nitrogen or hydrocarbons. <u>Electrical gas or smoke analysis apparatus are mainly for determining and measuring the content of the following gases: carbon dioxide, carbon monoxide and hydrogen, oxygen, hydrogen, sulphur dioxide, ammonia.</u>

EN. 90.27(8) (emphasis added).

These authorities show that, in the context of heading 9027, the act of chemical analysis is a different *type* of determination than measuring. *See* Pl. Reply Br., at 7. The act of chemical analysis is generally summarized as determining one or more ingredients of a substance either as to kind or amount. *See* 300 F. Supp. at 458. Whereas, "measuring" generally involves determining the amount (or size or degree) of something or a whole substance. To illustrate the distinction, one can measure the amount of water in a glass by emptying the contents into a measuring cup marked in standard units. However, comparatively, if one wanted to determine the amount of water present in a glass containing milk (*i.e.*, the water content of the milk), it would require a different type of determination. One would have to analyze the milk to determine its constituent ingredients.

As noted above, this distinction between the common definition of "measure" and the *Burrows* court's definition of "chemical analysis" is supported by the terms of the tariff. The items of heading 9026 are examples of measuring devices such as flow meters and level gauges, marked in standard units, and used directly on gases and liquids to obtain volume and velocity measurements. *See* Def. Cross-Mot., at 54-56. Consistent with the definition of "measure," flow meters are "based on primarily a one-step, physical measurement." *Id.* at 54.

8

Comparatively, the items of heading 9027 perform the act of chemical analysis.  In the present case, exhaust gas is comprised of more than one ingredient.  Therefore, chemical analysis is required to determine the amount of each constituent ingredient or component.  It requires chemical reactions that separate, detect, and quantify one or more components (ingredients) of the exhaust gas to determine the kind or amount of one of the components.  Indeed, that is how the Smart NOx Sensor's Probe is able to generate the raw data from which the NOx concentration in the exhaust gas is ascertained and why it meets the *Burrows* definition of chemical analysis.  Specifically, the Probe determines the presence of NOx (kind of ingredient) in the exhaust gas, and it also determines the concentration (amount) of NOx, expressed in milliamperes, before being further refined into ppm units.  *See* Pl. Resp. to Def. SOF, ¶¶ 12, 14 (admitting all of paragraph 14, except for the second sentence); 300 F. Supp. at 458.  And unlike measuring devices such as flow meters and level gauges, the Probe lacks markings in standard units, because it requires a series of chemical reactions and processes (which together constitute chemical analysis) in order to ascertain the concentration of NOx in the exhaust gas.

Continental also claims that the Smart NOx Sensor does not meet the Burrows court's second definition of "chemical analysis" because it cannot "determine what elements are present in the exhaust gas".  Pl. Reply Br., at 8.  But both parties agree that the sensor *can* determine the concentration of NOx in the exhaust gas.  *See* Pl. Resp. to Def. SOF, ¶¶ 16-17.  Continental has also averred that the Smart NOx Sensors "measure $O_2$ and NOx concentration" in the exhaust gas.  *Id.*, ¶ 5.  Moreover, the *Burrows* court also described instruments or apparatus for physical or chemical analysis as those that, in part, "determine[] what elements are present in a chemical substance."  300 F. Supp. at 458.  Continental's description of the merchandise shows that the Probe meets this portion of the definition.  The electrodes in the Smart NOx Sensor Probe's

electrochemical cells "are selective for $O_2$ or NOx". Pl. Resp. to Def. SOF, ¶ 10. In other words, these selective electrodes only react to (*i.e.*, detect) $O_2$ or NOx—and not other chemical elements or compounds in the exhaust gas, such as water vapor, carbon monoxide, carbon dioxide, or hydrocarbons. As such, the Probe specifically detects the presence of $O_2$ and NOx in the exhaust gas. Consequently, the Smart NOx Sensor's Probe determines the presence of oxygen and NOx in the exhaust gas.

Continental also tries to distinguish the Smart NOx Sensor from the vitascope in *Burrows* by trivializing the sensor's function. Continental argues that the vitascope examined in *Burrows* is unlike the Smart NOx Sensor because "[i]n addition to detecting the presence of a specific enzyme within a seed, the [vitascope] also allowed for a chemical reaction to occur, wherein the enzyme reacted with a tetrazolium solution within the device to release hydrogen, which in turn turned into a red formalazine." Pl. Reply Br., at 8 (emphasis added). Continental acknowledges this is a "complex, multi-step process," but argues that it is "much more than what the NOx sensor can do." *Id.* Not so. Whereas Continental discusses in detail the chemical reaction that occurs in the vitascope, Continental minimizes the significance of the processes of the Smart NOx Sensor by stating that it "merely react[s] to the combined presence of NOx." *Id.* Missing from Continental's description of the merchandise are the facts that the sensor's Probe detects the presence of ingredients ($O_2$ and NOx) within a substance (exhaust gas), and also allows for a series of chemical reactions to occur within the Probe, which in turn allow for the quantification of the concentration of NOx in the exhaust gas through the generation of an electrical signal that is proportional to the concentration of NOx and which is then translated and enhanced by the sensor's SCU. *See* Pl. Resp. to Def. SOF, ¶¶ 8-14; Def. Cross-Mot., at 14-17.

Continental's arguments involving the *Pharmacia* court's analysis are equally unavailing. *See* Pl. Reply Br., at 8-9; 9 CIT at 438. Continental notes that the filtering and purifying devices in *Pharmacia* were found not to be analytical apparatuses; indeed, they were classified under a provision for "filtering and purifying apparatus for liquids." *See Pharmacia*, 9 CIT at 438. Although Continental is not seeking to have its merchandise classified under such a provision, Continental appears to compare the devices in *Pharmacia*, which it describes as "merely separat[ing] ingredients in a liquid to obtain a purified substance", with the Smart NOx Sensor, whose functions Continental describes as "disassociat[ing] the oxygen atoms to calculate the concentration of NOx." Pl. Reply Br., at 8-9. This comparison is inapposite, particularly since Continental's summary of the Probe's functions is incomplete. *See* Pl. Resp. to Def. SOF, ¶¶ 8-14.

Continental's factual comparisons between the merchandise of *Pharmacia* and this case are tenuous as there is no mention of chemical reactions performed by the filters and purifiers in *Pharmacia*, unlike the chemical reactions that do take place in the Smart NOx Sensor's Probe. *See* 9 CIT at 438-442; Pl. Resp. to Def. SOF, ¶¶ 8-14. The devices in *Pharmacia* are described as plastic tubes with chromatography media that separate liquid mixtures passing through them, in order to purify the liquids. 9 CIT at 439, fn 4. The *Pharmacia* court found that the merchandise "provides no information regarding the chemical or physical properties of a substance. The user obtains a purified substance." *Id.* at 442. In contrast, the Probe does provide information regarding the chemical or physical properties of a substance, because it generates the raw data for determining the NOx concentration in the exhaust gas. *See* Pl. Resp. to Def. SOF, ¶¶ 8-14.

11

Further, Continental argues that the Government's expert witness, Dr. Calvin Bartholomew, admitted in his deposition that the Smart NOx Sensor does not perform all of the steps of chemical analysis and that the sensor can do nothing. *See* Pl. Reply Br., at 9. Not so. Dr. Bartholomew testified that the sensor performs all the steps of chemical analysis: "Q. Your opinion is that the NOx sensor does all these steps that are outlined here? A. Yes." ECF 56-16, Add. Tab 16, Bartholomew Dep. Tr., 119:13-120:15. Moreover, Dr. Bartholomew acknowledged that the sensor performs each of the three steps of his definition of chemical analysis:

> Q. Are those sub-steps of the separation step?
> A. Yes. So that—those are the first steps that involve the removal of oxygen and of other species—if you look at the details of these NOx sensors, they can also remove other species, as well, like carbon monoxide and hydrocarbons. But there are different ways—you can do catalytic removal of them, which is probably one of the best ways; but the important thing is to separate out the oxygen, and that's done in the first two cells. And then you have the NOx, and you measure or you detect the NOx as proportional to the current during the dissociation of NO. So that's the second. And then the third is that the signal will be collected by the SCU and will be processed to produce the results in PPM.

*Id.*, at 120:25-121:14. In our opening papers, we explained in detail Dr. Bartholomew's view of how the Probe performs the function of chemical analysis. *See* Def. Cross-Mot., at 38-39.

In conclusion, the undisputed facts show that the Probe preforms the function of chemical analysis, pursuant to the plain meaning of that term as defined by the dictionary, the case law, and the field of analytical chemistry.

## II.    THE SMART NOx SENSOR'S PROBE IS AN ELECTRICAL "GAS OR SMOKE ANALYSIS APPARATUS" IDENTIFIED *EO NOMINE* IN SUBHEADING 9027.10.20

In our opening papers, we demonstrated that the Smart NOx Sensor's Probe fits within the plain meaning of the *eo nomine* exemplars of heading 9027 as a "gas or smoke analysis

12

apparatus[,]" and even more specifically in subheading 9027.10.20, as a "[g]as or smoke analysis apparatus: Electrical."

In reply, Continental advances a threshold legal argument stating that "headings 9027 and 9026 are principal use provisions and not *eo nomine*." Pl. Reply Br., at 10. Continental's arguments are without support. First, as we explained in our opening brief, the imported merchandise is classified in heading 9027 pursuant to an *eo nomine* analysis, not principal use. Heading 9027 covers "[i]nstruments and apparatus for physical or chemical analysis[,]" among other items. As we stated in our opening brief, the inclusion of the term "for" in this phrase may signify that the heading is a principal use provision. *Compare Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312 (Fed. Cir. 2012) (holding that Heading 2104, insofar as it covers preparations for soups and broths, is a principal use provision), with *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1164 (Fed. Cir. 2017) (holding that, although Heading 6909 recites the use of ceramic products "for" certain purposes, the operative question was whether the subject merchandise constituted a "ceramic ware" under the Heading's terms, thereby resulting in treating the Heading as *eo nomine*).

However, here, as in *Schlumberger*, an analysis of the factors of principal use is unnecessary because, as we demonstrated above, the Smart NOx Sensor's Probe is an electrical "Gas or smoke analysis apparatus," pursuant to the plain meaning of those terms, and is therefore classified in subheading 9027.10.20, HTSUS, in accordance with an *eo nomine* analysis. *See*, *e.g.*, *Schlumberger,* 845 F.3d at 1164 ("Heading 6914, which recites 'Other ceramic articles,' is unquestionably *eo nomine* because it describes the articles it covers by name.").

Second, even if we assume that headings 9027 and 9026 qualify as principal use provisions, the legal framework of principal use is a highly fact-intensive inquiry and requires

the Court to consider numerous factors.  *United States v. Carborundum Co.*, 63 C.C.P.A. 98, 102, 536 F.2d 373, 377 (1976); *Aromont*, 671 F.3d at 1312-1313.  Here, Continental put forward no evidence in its opening papers involving the factors of principal use.  *See* Pl. SOF.  And in its reply brief, Continental supports its argument with only a scant conclusory statement from its expert witness.  *See* Pl. Reply Br., at 11 (quoting the deposition of John Schuster at Tr. 29:7-22 (stating that "in the automotive industry" sensors are used "to measure and check things in the actual system . . . It's not used as an analysis device to do a study and investigation")).[3]

The case law also does not support Continental's argument.  In *Burrows*, the vitascope was found to be a device for chemical analysis not because it was used to do a study or investigation, or to perform a detailed examination, but rather because it "detected the presence or absence of enzymes in a particular sample of seed."  *Burrows*, 300 F. Supp. at 458.  In other words, it "determine[d] one or more ingredients of a substance either as to kind or amount."  *Id.* Like the plaintiff in *Burrows*, Continental here also "confuses the distinction between what the" Smart NOx Sensor's Probe "does and how it does it."  *See id.* at 459.  "What the [Probe] does is" provide the concentration of NOx in the exhaust gas.  *See id.*; *see also* Pl. Resp. to Def. SOF, ¶¶ 16-17.  It does this by determining the amount of NOx "in the [exhaust gas] through a []chemical reaction."  *See Burrows*, 300 F. Supp. at 459; *see also* Pl. Resp. to Def. SOF, ¶¶ 8-14.  "In short, while the function of the [Probe] is to provide" the NOx concentration in the exhaust gas, "the crucial consideration is that this function is accomplished by a []chemical analysis."  *See Burrows*, 300 F. Supp. at 459.  Continental's confusion surrounding this issue stems from its

---

[3] Even if the statement by Continental's expert witness was compelling and supported with evidence, it fails to prove Continental's argument because a device can be classified under heading 9027 irrespective of whether it is used "to do a study and investigation."  *See Burrows*, 300 F. Supp. at 458.

refusal to recognize that the data or value for the concentration of NOx determined by the Probe is obtained solely via the process of chemical analysis. *See Burrows*, 300 F. Supp. at 459.

Continental argues that the definition of "gas or smoke analysis apparatus" from the ENs for heading 9027 "does not mention NOx" nor does it "contain any words indicating that the list of the substances the apparatus determines is not exclusive." Pl. Reply Br., at 11-12. Continental also argues that "[a]n exhaust-gas analyzer [is] a distinct, defined apparatus the function of which is entirely different from the NOx sensor." *Id*., at 12. This argument misinterprets EN 90.27(8).

As discussed in detail in our cross-motion, EN 90.27(8) explains, in part, that "gas or smoke analysis apparatus" are used "to analyze combustible gases or combustion by-products (burnt gases) in coke ovens, gas producers, blast furnaces, <u>etc.</u>, <u>in particular</u>, for determining their content of carbon dioxide, carbon monoxide, oxygen, hydrogen, nitrogen or hydrocarbons." Def. Cross-Mot., at 31-35 (emphasis added). In arguing that the list of items in the EN is exclusive, Continental ignores the words "etc." and "in particular", which show that the list is not exclusive. EN 90.27(8). The term "etc." indicates that the enumerated devices are some—but not all—possible examples of gas analyzers. Similarly, the phrase "in particular" means "especially (used to show that a statement applies to one person or thing *more than any other*)." Google Oxford Languages, *available at* https://www.google.com/search?q=in+particular +definition (last viewed March 7, 2022) (emphasis added); *see also* Pl. Reply Br., at 11-12.

Moreover, the ENs are explanatory in nature and cannot limit or expand the terms of the tariff headings, just as subheadings cannot be used to expand the scope of their respective headings. *See R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1353 (Fed. Cir. 2014) ("Pursuant

15

to GRI 1, the possible headings are to be evaluated without reference to their subheadings, which cannot be used to expand the scope of their respective headings.").

Because heading 9027 contains no restriction as to the type of gases that a "gas analysis apparatus" can analyze, the EN cannot be construed to limit the types of gases.  For this reason, the gases listed under EN 90.27(8) are simply examples of the most common types of gases that gas analysis apparatus were capable of analyzing at the time the EN was drafted.  Indeed, as noted in our opening papers, diesel exhaust nitric oxide gas analyzers did not exist until the 1990s, and devices like the Smart NOx Sensor were not developed for gasoline engines until the 2000s and 2010s.  *See* Def. Cross-Mot., Ex. 3, Tab A, at 14.  As such, the language of heading 9027 and EN 90.27(8) does not support Continental's argument that a gas analyzer can be classified under 9027 *only* if it analyzes one of the exemplar gases listed in EN 90.27(8).

Significantly, Continental has failed to address defendant's argument regarding EN 90.27(8)(viii), which describes the design and functions of the Smart NOx Sensor's Probe.  *See* Pl. Reply Br.  EN 90.27(8)(viii) explains that heading 9027 includes devices that work on the basis of "[e]lectrochemical reaction in cells with solid (especially zirconium oxide for oxygen analysis) or liquid electrolytes."  Here, the Probe quantifies NOx concentration through "electrochemical reaction[s] in cells with solid . . . zirconium . . . electrolyte," and more specifically by the pumping of dissociated oxygen through zirconium electrolyte.  *See* Pl. Resp. to Def. SOF, ¶¶ 8-12.  As such, this EN applies specifically to devices like the Smart NOx Sensor's Probe.

Finally, Continental discusses the Horiba Automotive Test Systems, Motor Exhaust Gas Analyzer Mexa-One as a means of limiting the scope of the products covered by the Explanatory Note.  *See* Pl. Reply Br., at 12-13.  Continental's discussion, however, does not preclude the

16

Smart NOx Sensor and its Probe from performing the function of chemical analysis of exhaust gas. *See id.* at 12. Indeed, technology has advanced (and will continue to advance) over time. Although the Motor Exhaust Gas Analyzer Mexa-One may be an example of a complex gas analyzer, the complexity of the device is not a relevant factor under the common meaning of chemical analysis. For example, the *Burrows* description of chemical analysis calls for the determination of at least <u>one</u> ingredient of a substance as to either kind or amount. *See* 300 F. Supp. at 458. It does not impose a requirement involving the complexity of the device.

### III.   THE SMART NOx SENSOR'S PROBE CANNOT FALL UNDER HEADING 9026, PURSUANT TO THE TERMS OF BOTH HEADINGS 9026 AND 9027, AS WELL AS TO EXPLANATORY NOTES 90.26 AND 90.27(8)

Continental argues that the Smart NOx Sensor is an instrument or apparatus for measuring or checking a process variable of a gas, *i.e.*, NOx concentration, under heading 9026. Pl. Reply Br., at 15. However, heading 9026 does not include all devices that determine *any* variable or process variable. As discussed in detail in our opening papers, heading 9026 only includes devices for measuring certain variables: "flow, level, pressure or other variables of liquids or gases". Def. Cross-Mot., at 47-54. EN 90.26 explains that "other variables" includes "kinetic energy or other process variables," and EN 90.26(d) further provides that "[i]nstruments and apparatus for physical or chemical analysis, etc. (heading 90.27)" are expressly excluded from classification under heading 9026. McGraw-Hill Education's *Chemical Engineering: The Essential Reference* includes the following as process variables: temperature, pressure, moles and molecular weights, mass and volume, <u>viscosity</u>, <u>surface tension</u>, heat capacity and thermal conductivity, diffusion coefficients, pH, Reynolds number, the ideal gas law, and property estimation. Def. Cross-Mot., at 52 (emphasis added). However, heading 9027 specifically includes "instruments and apparatus for <u>measuring or checking</u> <u>viscosity</u>, porosity, expansion,

17

surface tension or the like".  (emphasis added).  Further, heading 9027 also specifically includes "instruments and apparatus for measuring or checking quantities of heat, sound or light (including exposure meters)".  (emphasis added).

Thus, the phrase "other variables" from heading 9026, as well as the phrase "other process variables" from EN 90.26, cannot mean *any* other variable or process variable, as Continental's argument implies.  This is because devices that "measure or check" process variables such as "viscosity," "surface tension," or "the like" must be classified under heading 9027, given that heading 9027 specifically indicates that it includes devices that measure or check these process variables.  Consequently, heading 9026 includes instruments and apparatus that measure or check *certain* types of variables (flow, level, pressure, kinetic energy) and which are *not excluded* by the variables and process variables specifically described in heading 9027. Continental fails to address defendant's argument highlighting the inclusion of other process variables in the tariff terms in heading 9027, and their resultant exclusion from heading 9026.

Furthermore, as we explained in our opening papers, Continental's interpretation of EN 90.26 is contrary to the plain meaning of the terms of that note, as well as to the plain meaning of heading 9027.  EN 90.26 begins with the exclusionary phrase, "Apart from instruments or apparatus more specifically covered by other headings of the Nomenclature, such as:" and proceeds to list goods in four headings that are not covered by heading 9026.  The fourth such group of goods that is excluded from classification under heading 9026 is "[i]nstruments and apparatus for physical or chemical analysis, etc. (heading 90.27)."  This exclusionary note dovetails with the terms of heading 9027, which covers "instruments and apparatus" for "chemical analysis."  Instruments and apparatus for chemical analysis necessarily includes apparatus for determining or measuring the chemical composition of gas.  *See supra*, Part II

(discussing EN 90.27(8) which explains that "Electrical gas or smoke analysis apparatus are mainly for *determining and measuring the content of the following gases*: carbon dioxide, carbon monoxide and hydrogen, oxygen, hydrogen, sulphur dioxide, ammonia." (emphasis added)). Therefore, interpreting the phrase "measuring or checking . . . other process variables of liquids or gases" (from EN 90.26) as including the measuring of the chemical composition of gas would render the exclusionary clause of EN 90.26, and the plain language of heading 9027, a nullity.

In addition, the opening clause in EN 90.26 reminds us that apparatus which are "more specifically covered by other headings of the Nomenclature" should be classified where they are more specifically described, and one of the four provisions specifically identified in the note is heading 9027. Moreover, as discussed in Part II, *supra*, EN 90.27(8)(viii) explains that heading 9027 includes devices that work on the basis of "[e]lectrochemical reaction in cells with solid (especially zirconium oxide for oxygen analysis) or liquid electrolytes", a more specific description which closely aligns with the design and functions of the Smart NOx Sensor's Probe. *See* Pl. Resp. to Def. SOF, ¶¶ 8-12.

Continental argues that EN 90.27(8) "limits the definition of 'gas or smoke analysis apparatus' to, among other things, 'electrical gas or smoke analysis apparatus…for determining and measuring the content of the following gases: carbon dioxide, carbon monoxide and hydrogen, oxygen, hydrogen, sulphur dioxide, ammonia.'" Pl. Reply Br., at 16. This interpretation is not supported by the law. First, as explained in Part II, *supra*, ENs are explanatory in nature and cannot "limit" or expand the terms of the tariff headings. Second, Continental omits the key word "mainly" from this portion of EN 90.27(8). This term signifies that the list is not exclusive. *See id.* As such, Continental's argument that the EN limits the types of gases that a gas analysis apparatus can analyze and still be classified under heading 9027

is not supported by the language of the tariff or the ENs.  Read together, heading 9026 excludes

apparatus that conduct chemical analysis, which belong in heading 9027 and which include

devices that determine the chemical content, composition, or concentration of gases.

Continental's discussion of the classification of a hydrogen sensor in support of its

interpretation of heading 9026 is also flawed for a number of reasons.  Pl. Reply Br., at 17.

Continental claims that the hydrogen sensor classified by CBP in Ruling N270334 can

"'determine' and measure hydrogen out of the multiple components of air, such as $N_2$, $O_2$, $CO_2$,

$H_2O$, and Ar, <u>outside</u> a vehicle's fuel tank[.]"  *See* Pl. Reply Br., at 17 (emphasis added).  First,

CBP did not classify the hydrogen sensor in that ruling under either heading 9026 or 9027, but

rather under heading 8543 which includes electric synchros and transducers.  Second, the facts in

that ruling are different from those in this case, as the ruling indicates that the hydrogen sensor is

"positioned <u>within</u> a hydrogen storage tank[,]" and not <u>outside</u> a vehicle's fuel tank as

Continental claims.  ECF 56-6, at 1 (emphasis added).  Third, the ruling does not describe how

the hydrogen sensor works, so it is not possible to compare the functions of the merchandise of

that ruling with the functions of the Smart NOx Sensor.  Fourth, the ruling indicated that the

hydrogen sensor performs no analysis.  Finally, Continental fails to cite any evidence to support

its claim that the hydrogen is capable of measuring hydrogen concentrations or differentiating

hydrogen gas from other components in the air, and the details on which Continental relies are

not included in the ruling.  *See* Pl. Reply Br., at 17, 18 fn 7.  As such, Continental's argument

that defendant ignores the ruling classifying the hydrogen sensor is also without merit.

Finally, Continental's argument that the Smart NOx Sensor is similar to the exemplar

devices under heading 9026 is without support.  As explained *supra* and in our opening papers,

the Smart NOx Sensor is unlike the exemplar devices in heading 9026 because those exemplars

measure variables included in heading 9026, whereas the Smart NOx Sensor determines the variable of content or concentration, which is excluded under heading 9026 by EN 90.26, and included in heading 9027 by EN 90.27(8).  See Def. Cross-Mot., at 36-38, 54-58.

## IV.    DEFENDANT HAS NOT WAIVED ARGUMENTS

Continental claims that defendant has disregarded several arguments raised by Continental "regarding the [*sic*] Customs' prior rulings and the inconsistencies in Defendant's deliberations with respect to the classification of the NOx sensor[.]"  Pl. Reply Br., at 18-19.  In this respect, Continental claims that defendant has waived any arguments in response.  *Id.*

Continental is incorrect.  First, in its cross-motion, defendant addressed each classification ruling cited by Continental in its motion for summary judgment, and further demonstrated that, aside from the ruling issued for the merchandise at hand, *see* ECF 56-5, Add. Tab 5 (Ruling HQ H262310), the rulings discussed by Continental were inapposite to the present case.  Def. Cross-Mot., at 58-61.  As reflected in our opening papers, CBP's classification of the Probe in this case is consistent with the law and CBP's prior rulings.  Therefore, there is no issue of waiver.

Second, the standard of review for this case is *de novo*, based on the judicial record before the Court.  28 U.S.C. § 2640(a)(1).  "Customs' ruling letters, as explanations of classification decisions, are entitled to a level of 'respect proportional to their power to persuade.'"  *Plexus Corp. v. United States*, 489 F. Supp. 3d 1379, 1402 (Ct. Int'l Trade 2020) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)).  In this respect, Continental's claim of waiver places too great of significance on administrative ruling letters as they are not binding on the Court.

21

# **CONCLUSION**

As we have demonstrated above and in our cross-motion, the Smart NOx Sensor's Probe is properly classifiable as an apparatus for chemical analysis under heading 9027, HTSUS, and more specifically as an electrical gas analysis apparatus under subheading 9027.10.20, and not as an electrical measuring or checking apparatus under subheading 9026.80.20.  For all the foregoing reasons, we respectfully request that the Court deny Continental's motion for summary judgment, grant the Government's cross-motion for summary judgment, and dismiss this action.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:      /s/ Justin R. Miller
         JUSTIN R. MILLER
         Attorney-In-Charge
         International Trade Field Office

*Of Counsel*:                        /s/ Brandon A. Kennedy
Edward Maurer                        BRANDON A. KENNEDY
Acting Assistant Chief Counsel       Trial Attorney
Michael Anderson                     Civil Division, U.S. Dept. of Justice
General Attorney                     Commercial Litigation Branch
Office of the Assistant Chief Counsel 26 Federal Plaza, Room 346
International Trade Litigation        New York, New York 10278
U.S. Customs and Border Protection   Tel.: (212) 264-9230
New York, New York 10278             *Attorneys for Defendant*

Dated: March 8, 2022

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. JANE A. RESTANI, *JUDGE*

_____

| | | |
|---|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 18-00026 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Brandon A. Kennedy, a Trial Attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is the attorney responsible for the foregoing brief, relying upon the word count feature of the word processing program used to prepare the response, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 6,804 words.

/s/ Brandon A. Kennedy
BRANDON A. KENNEDY